# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued December 5, 2019　　　　Decided October 13, 2020

No. 19-5052

NORTH AMERICAN BUTTERFLY ASSOCIATION,
APPELLANT

v.

CHAD F. WOLF, IN HIS OFFICIAL CAPACITY AS ACTING
SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02651)

————

*Timothy K. Beeken* argued the cause and filed the briefs for appellant.

*Jeffrey S. Beelaert*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, and *Eric Grant*, Deputy Assistant Attorney General.

Before: TATEL, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting opinion filed by *Circuit Judge* MILLETT.

PILLARD, *Circuit Judge*:  The National Butterfly Center, a 100-acre wildlife sanctuary and botanical garden owned by the nonprofit North American Butterfly Association, lies along the border between the United States and Mexico.  Butterfly Center staff discovered in 2017 that a segment of the wall the U.S. Department of Homeland Security (DHS) plans to build on the border with Mexico would run through the Center's premises.  After DHS confirmed that plan and asserted control over parts of the Center, the Butterfly Association sued.

The Association contends that DHS' presence on and use of parts of its property to prepare for and carry out construction of a border wall violate the Fourth and Fifth Amendments to the United States Constitution and two environmental statutes. The district court dismissed all claims, concluding the Association stated no viable constitutional claim and that section 102(c)(2)(A) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009, 3009-546, as amended (IIRIRA) (codified at 8 U.S.C. § 1103), strips jurisdiction over the statutory claims because the DHS Secretary waived application of environmental laws with respect to the construction of roads and physical barriers to be built at the Center.  *See N. Am. Butterfly Ass'n v. Nielsen*, 368 F. Supp. 3d 1, 4 (D.D.C. 2019). We affirm dismissal of the Butterfly Association's statutory and Fourth Amendment claims but reverse dismissal of the Fifth Amendment claim and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

In our *de novo* review of the district court's order dismissing under Federal Rule of Civil Procedure 12(b)(1) and

12(b)(6) the Butterfly Association's claims, we accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the Butterfly Association's favor. *See Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 338-39 (D.C. Cir. 2018). Like the district court, we consider "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

## A. Factual Allegations

Located in southern Texas, the National Butterfly Center attracts visitors to its nature trails, conservation areas, educational exhibits, and plant nursery. *See* Am. Compl. ¶¶ 15, 46 (J.A. 24, 31). The Center affords visitors the chance to view and learn about wild butterflies as well as the several endangered plant and animal species on its premises. *See id*. ¶¶ 49-50 (J.A. 32). Because it abuts the Rio Grande River separating Texas from Mexico, the Center falls within DHS' Rio Grande Valley Border Patrol Sector, a 17,000-square-mile area that DHS patrols to protect border security and police immigration from Mexico. *See id*. ¶¶ 15, 19 (J.A. 24-25).

Shortly after taking office, President Trump directed DHS to take "all appropriate steps to immediately plan, design, and construct a physical wall along the southern border, using appropriate materials and technology to most effectively achieve complete operational control of the southern border." Executive Order No. 13,767, § 4(a), 82 Fed. Reg. 8793, 8794 (Jan. 25, 2017). As statutory authority for his directive, President Trump invoked IIRIRA, *see id*., which for more than a decade has authorized DHS to "deter illegal crossings in areas

of high illegal entry into the United States" by "tak[ing] such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border," IIRIRA § 102(a). To facilitate such construction, IIRIRA authorizes the DHS Secretary "to waive all legal requirements" that she, "in [her] sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section," *id*. § 102(c)(1), and strips district courts' jurisdiction over all non-constitutional claims "arising from any action undertaken, or any decision made, by the Secretary" pursuant to the waiver authority, *id*. § 102(c)(2)(A).

To implement Executive Order No. 13,767, the Secretary sent a memorandum to senior DHS officials that instructed the U.S. Customs and Border Protection (CBP), an agency within DHS, to

> immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border.

Memorandum from John Kelly, DHS Sec'y, to Kevin McAleenan, CBP Acting Comm'r, et al. at 5 (Feb. 20, 2017) (J.A. 415) (DHS Memo). Several months later, in July 2017, the Butterfly Center's Executive Director, Marianna Wright, discovered CBP contractors using heavy equipment to "cut down trees, mow brush, and widen a private road" at the Center. Am. Compl. ¶ 53 (J.A. 33). Noticing that the work

crew had already cleared up to eighteen feet on either side of the private roadway within the Center's grounds and observing additional signs of planned construction work, *see id*. ¶¶ 53-54 (J.A. 33), Wright contacted CBP, which asserted "blanket authority" to conduct border-infrastructure activities at the Butterfly Center, *id*. ¶ 55 (J.A. 33).

Manuel Padilla, Jr., CBP's Chief Patrol Agent for the Rio Grande Valley Border Patrol Sector, visited the Butterfly Center in August 2017. *See id*. ¶¶ 19, 56 (J.A. 25, 34). He explained to Wright that the planned border wall would cross through the Center, *see id.* ¶ 56 (J.A. 34), and that "additional large areas of the Butterfly Center would be cleared for secondary roads and government operations," *id*. ¶ 57 (J.A. 34). In total, the Butterfly Association would be forced to relinquish control over some two thirds of the Center's premises, *see id*. ¶ 56 (J.A. 34), which, Wright anticipated, would "effectively destroy[] it and leav[e] behind a 70-acre no-man's land between the proposed border wall and the Rio Grande," *id*. ¶ 15 (J.A. 24-25).

Padilla also informed Wright that CBP had placed sensors at undisclosed locations throughout the Center and instructed the Butterfly Association not to gate or lock the Center. *See id*. ¶¶ 59-60 (J.A. 34). Padilla cautioned that any gates or locks would be destroyed. *See id*. ¶ 60 (J.A. 34). Consistent with Padilla's warning that border-wall construction would necessitate a "green uniform presence" of Border Patrol agents, *id*. ¶ 58 (J.A. 34), CBP now regularly stations its personnel at the Center, *see id*. ¶ 62 (J.A. 35). CBP agents "assert that vast stretches of the property are off limits to Butterfly Center employees and visitors." *Id.*

CBP agents and other DHS officials have authority to enter private lands, like the Butterfly Center, within twenty-five

miles of any international U.S. border, but that authority is limited to entries "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3). DHS defines "patrolling the border" as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c).

DHS has not analyzed the environmental impact of border wall-related activities conducted at the Butterfly Center since 2017, *cf.* 42 U.S.C. § 4332(2)(C); Am. Compl. ¶ 66 (J.A. 35), nor consulted with other federal agencies about how to minimize the impact of those activities on endangered species, *cf.* 16 U.S.C. § 1536(a)(2); Am. Compl. ¶ 76 (J.A. 37). Crucial to application of IIRIRA's jurisdiction-stripping provision, *see* IIRIRA § 102(c)(2), when the Butterfly Association filed this suit in December 2017, the DHS Secretary had not yet exercised her statutory authority "to waive [any] legal requirements" she "determine[d] necessary to ensure expeditious construction of the barriers and roads under [IIRIRA section 102(a)-(b)]," *id*. § 102(c)(1).

## B. Procedural History

The Butterfly Association's suit against DHS comprises four causes of action, two arising under environmental statutes and two under the Constitution. As a statutory matter, the Association claims that DHS' failure to complete an environmental impact statement or consult with the United States Fish and Wildlife Service in connection with DHS' activities at the Butterfly Center violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*; *see* Am. Compl. ¶¶ 63-71 (J.A. 35-36), and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.*; *see* Am. Compl. ¶¶ 72-78 (J.A. 36-37). The Association also claims DHS

seized parts of the National Butterfly Center in violation of the Fourth Amendment, *see* Am. Compl. ¶¶ 84-89 (J.A. 38), and deprived the Association of various property interests in its Center without due process of law, in violation of the Fifth Amendment, *see id*. ¶¶ 79-83 (J.A. 37-38). In addition to costs and attorney fees, the Association seeks declaratory and injunctive relief. *See id*. at pp. 19-20 (J.A. 39-40).

DHS moved to dismiss the Butterfly Association's claims for lack of subject-matter jurisdiction and for failure to state a claim. After the parties fully briefed that motion, and some ten months after the Association filed suit, the DHS Secretary exercised her authority under IIRIRA section 102(c)(1) to waive application of various laws to DHS actions at the Butterfly Center. Specifically, she decided to waive "in their entirety" application of NEPA and ESA "with respect to the construction of roads and physical barriers (including, but not limited to, accessing the project area, creating and using staging areas, . . . and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors)." Determination Pursuant to Section 102 of [IIRIRA], as Amended, 83 Fed. Reg. 51,472, 51,473 (Oct. 11, 2018) (Waiver Determination). Once the Waiver Determination issued, DHS supplemented its motion to dismiss, arguing that IIRIRA section 102(c)(2)(A)'s jurisdictional bar now applies to the Butterfly Association's statutory claims. After the parties fully briefed DHS' supplemental motion, the Association moved for preliminary injunctive relief.

Before addressing the Butterfly Association's request for preliminary injunctive relief, the district court on February 14, 2019, issued a memorandum opinion and order dismissing the Association's claims. *See Butterfly Ass'n*, 368 F. Supp. 3d at 4. The court held that IIRIRA section 102(c)(2)(A) deprived it of

jurisdiction over claims invoking environmental laws subject to the Secretary's Waiver Determination, so it dismissed the Association's statutory claims under Federal Rule of Civil Procedure 12(b)(1). *See id*. at 10. The district court dismissed the two constitutional claims as not legally cognizable. The court held that "the confluence of the Butterfly Center's open field status and defendants' constitutional and statutory authority at the border compels dismissal of [the] Fourth Amendment claim under Rule 12(b)(6)." *Id*. at 7. And, whether viewing it as "an authorized-but-uncompensated taking claim" or as a procedural due process claim, the court considered the Association's Fifth Amendment claim "premature" and thus "unripe." *Id*. at 8.

The next day, Congress passed and President Trump signed an appropriations package that appears to have afforded the Butterfly Association much of the relief it seeks in this litigation. While funding "the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector," Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 230(a)(1), 133 Stat. 13, 28 (2019 Appropriations Act), and "the acquisition and deployment of border security technologies and trade and travel assets and infrastructure," *id.* § 230(a)(2), Congress specified that "[n]one of the funds made available by this Act or prior Acts are available for the construction of pedestrian fencing . . . within the National Butterfly Center," *id.* § 231(4). The following year, Congress placed a similar limit on its 2020 appropriation of funds for "construction of [a] barrier system along the southwest border," "the acquisition and deployment of border security technologies," "facility construction and improvements," "integrated operations assets and infrastructure," and "mission support and infrastructure." Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 209(a), 133 Stat. 2317, 2511 (2020 Appropriations Act). The 2020 Appropriations Act, too,

provides that "[f]ederal funds may not be made available for the construction of fencing . . . within the National Butterfly Center." *Id*. § 210(4).

Eighteen days after the district court's dismissal order, the Butterfly Association commenced this appeal. Notwithstanding the restrictions in the recent Appropriations Acts, the Association contends that CBP is engaged in "ongoing violations" of the Association's statutory and constitutional rights in the Butterfly Center. Reply Br. 10. The Association argues that, rather than mooting the case, the funding restrictions defeat the DHS Secretary's waiver of the environmental laws that form the basis of its statutory claims. The Association also asserts that the Secretary's failure to fulfill her duty under IIRIRA to consult stakeholders before issuing the Waiver Determination renders the Determination *ultra vires*, that the Butterfly Center's open fields are protected from Fourth Amendment seizures, and that its Fifth Amendment claim is ripe because CBP has already intruded and still threatens to intrude onto the Center without due process of law.

## II. JURISDICTION

Before reaching the merits of the Butterfly Association's appeal, we must address three questions about our appellate jurisdiction. First, we *sua sponte* raised a threshold jurisdictional question that we asked counsel to address at oral argument: "whether the finality requirement of 28 U.S.C. § 1291 is met here, given that the district court dismissed" the Association's claims "without prejudice and with leave to amend." Order, No. 19-5052 (D.C. Cir. Nov. 27, 2019) (per curiam). Second, the government contends that the 2019 and 2020 Appropriations Acts' funding restrictions on constructing fencing at the Butterfly Center moot the claims insofar as they

preclude DHS from engaging in the conduct alleged in the complaint, and deprive the Butterfly Association of any current or certainly impending injury to support its standing to challenge CBP's activities going forward. Third, the government asserts that IIRIRA section 102(c)(2)(C)'s limitation on appellate review of claims arising from the DHS Secretary's waiver authority means the Association can obtain review of its surviving claims, if any, only in the Supreme Court.

## A. Timely Appeal from a Final Decision

We have jurisdiction over appeals from "final decisions" of the district court, 28 U.S.C. § 1291, provided the appeal is timely as measured from "entry" of the "judgment, order or decree" announcing the final decision, *id*. § 2107. Notwithstanding the parties' agreement that the district court's dismissal order was final, *see* Oral Arg. Tr. 4:3-6 (Butterfly Association), 28:18-20 (DHS), we must independently determine its finality under section 1291 and timeliness under section 2107. Specifically, we must determine whether the district court's minute order, noting on its docket sheet a time-limited grant of leave to amend the complaint, rendered nonfinal the court's otherwise final published opinion and order dismissing the case. As a practical matter, the question is whether the Butterfly Association was within its rights to appeal the dismissal without first requesting and obtaining from the district court an additional order confirming the finality of its judgment of dismissal.

Under 28 U.S.C. § 1291, "[a] decision 'is not final, ordinarily, unless it ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment.'" *Dukore v. District of Columbia*, 799 F.3d 1137, 1140 (D.C. Cir. 2015) (alteration omitted) (quoting *Cunningham v. Hamilton*

*County*, 527 U.S. 198, 204 (1999)).  Finality under section 1291 turns on "whether the district court intended the judgment to represent the final decision in the case." *Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 385 n.6 (1978) (per curiam).  As the Court has explained, the statute "emphasizes the deference that appellate courts owe to the trial judge," and "promot[es] efficient judicial administration." *Firestone Tire & Rubber v. Risjord*, 449 U.S. 368, 374 (1981).  We have accordingly noted the importance of discerning and "respect[ing] the intentions of the district court that entered the order." *Attias v. CareFirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017); *accord Ciralsky v. CIA*, 355 F.3d 661, 667 (D.C. Cir. 2004).

For purposes of section 1291 appealability, a district court's order of dismissal with prejudice is always final; a dismissal without prejudice also may be final if it ended the case as far as the district court was concerned.  *See, e.g.*, *Ciralsky*, 355 F.3d at 666.  To decide whether an order dismissing without prejudice "le[ft] nothing more for the [district] court to do," making it final, or instead signaled the district court's expectation that "the action [would] continue," we closely examine the relevant order and its surrounding circumstances.  *Attias*, 865 F.3d at 624; *see also Murray v. Gilmore*, 406 F.3d 708, 712-13 (D.C. Cir. 2005); *Ciralsky*, 355 F.3d at 667-68.  Our scrutiny of a without-prejudice dismissal often focuses on whether the district court dismissed the entire "case" or just the "complaint."  Ordinarily, when the district court dismisses the "case," even when it does so without prejudice to refiling, the litigation is over and the dismissal is final.  *See Attias*, 865 F.3d at 623; *Murray*, 406 F.3d at 712; *Ciralsky*, 355 F.3d at 666.

Here, the district court's memorandum opinion announced that "defendants' motions to dismiss are GRANTED, and this case is DISMISSED." *Butterfly Ass'n*, 368 F. Supp. 3d at 4.

The accompanying order dismissed all of the claims, not just the complaint. Order, Civil Case No. 17-2651 (RJL) (D.D.C. Feb. 14, 2019) (J.A. 722) (Dismissal Order). The court separately addressed the statutory and constitutional claims, rather than the case as a whole, because it said it was dismissing the constitutional claims without prejudice for failure to state a claim, and the statutory claims with prejudice for lack of subject-matter jurisdiction. *See id.*; *Butterfly Ass'n*, 368 F. Supp. 3d at 7-8, 10. But a dismissal for want of subject-matter jurisdiction can only be without prejudice, *see* Fed. R. Civ. P. 41(b); *Havens v. Mabus*, 759 F.3d 91, 98 (D.C. Cir. 2014), so we understand the district court's dismissal of the entire case—for what it saw as a mix of jurisdictional and non-jurisdictional defects—to have been without prejudice. Because we treat dismissal of a case as declaring an end to the litigation, and thus as final and appealable despite the court's specification that it is without prejudice, *see Ciralsky*, 355 F.3d at 666-68, the dismissal order here, taken alone, was final. But to confirm whether "the district court thought the order had terminated the action," *id*. at 667, we further consider the order in context.

On the same day that the district court entered its order dismissing the entire case, the district court separately wrote a minute order on its docket sheet granting the Butterfly Association unsolicited "leave to file a second amended complaint . . . , if any, within 14 days of the date of this Order." Minute Order, Civil Case No. 17-2651 (RJL) (D.D.C. Feb. 14, 2019) (minute order). The minute order unsettled during that fourteen-day period the finality of the otherwise unambiguous dismissal order. For our dissenting colleague, the minute order is "[k]ey." Diss. Op. at 2. We see it differently. As it happened, no amended complaint was filed, and the minute order's invitation to amend expired by its own terms after fourteen days. *See* 28 U.S.C. § 2107(b)(3). Put another way,

although the district court provided the Butterfly Association a brief opportunity to refile, "that does not change the fact that, in the absence of such an affirmative act on [the Association's] part, the case [wa]s at an end" upon the expiration of that period. *Ciralsky*, 355 F.3d at 667.

The record adequately reflects the district court's intention that its order finally end the case: In this context, we see no material distinction between the district court's dismissal order and an order stating that, in the event the plaintiff did not file an amended complaint on or before February 28, 2019, the order would then be final and appealable. This approach protects the district court's authority over when and on what terms its decisions become final. Because the district court unambiguously identified how, when, and why the case would end if there were no timely amendment—and there was none— the district court "disassociate[d] itself from [the] case" and rendered its decision final. *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408 (2015) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 42 (1995)). Without further action on plaintiff's part, the dismissal order "l[eft] nothing for the district court to do but execute the judgment" it had entered. *Dukore*, 799 F.3d at 1140 (alteration omitted) (quoting *Cunningham*, 527 U.S. at 204).

To be sure, our cases have explained that an order inviting amendment of a complaint or other ongoing litigation is ordinarily nonfinal, but none so held in a situation like this one. Indeed, this case bears little resemblance to those in which we have held district court orders to be nonfinal because they invited further proceedings. For example, in *Castro County v. Crespin*, 101 F.3d 121 (D.C. Cir. 1996), on which our dissenting colleague relies, Diss. Op. at 5, 8, the issue was whether plaintiff's fee petition was incorrectly denied as late because it was filed more than fourteen days after an order the

district court deemed final.  We reversed, holding that the specified order was nonfinal: It had only conditionally dismissed the action in order to provide thirty days—later extended by another month—for settlement negotiations during which period either party could move to reinstate the case. *Crespin*, 101 F.3d at 123.  By the end of the specified period the government took action resolving the case, *id*., and the "action concluded," *id*. at 127.  We held that the plaintiff's motion for attorneys' fees, filed more than fourteen days after the order of conditional dismissal but before the end of the reinstatement period and ultimate resolution, was timely.  *Id*. at 128.  This case is substantially different.  The order we held to be nonfinal in *Crespin* was entered before any merits resolution whatsoever, and it merely granted the parties' joint motion to stay the proceedings.  *Id*. at 123.

We similarly rejected a contention that an order earlier than the one appealed from was final in *Murray v. Gilmore*, 406 F.3d 708, in circumstances a bit closer to those now before us.  There, the court granted partial summary judgment "except with regard to Murray's due process claim," inviting reconsideration on that claim "at such time as plaintiff is able to clearly identify legal and factual bases for proceeding."  *Id*. at 712 (citation omitted).  Unlike here, the court in *Murray* had placed no limit on the time for the plaintiff to cure the identified shortfalls, and Ms. Murray took up the offer to try to do so.  After making a further submission that the district court deemed inadequate, she appealed and the defendant questioned our jurisdiction on the ground that the earlier order granting summary judgment was final, so Murray's appeal was too late.  We held the earlier order nonfinal, emphasizing, among other things, that the district court had only removed the case from its active calendar rather than dismissing the action.  *Id*.  The express time limitation on the amendment opportunity in this

15

case, and absence of any retention of the case on an inactive list, suffice to distinguish it from *Murray*.

Our conclusion comports with the Supreme Court's decision in *Jung v. K. & D. Mining Co.*, 356 U.S. 335 (1958) (per curiam). *Cf.* Diss. Op. at 11-15. The nonfinal order in that case dismissed only the "complaint," 356 U.S. at 336, whereas the district court here dismissed the "case," *Butterfly Ass'n*, 368 F. Supp. 3d at 4, and all of the Butterfly Association's "claims," *id.* at 10; Dismissal Order (J.A. 722). All told, the district court in *Jung* had entered three dismissal orders: The first dismissed the complaint but granted twenty days' leave to amend it, and the second denied plaintiffs' motion for reconsideration but granted a further twenty days leave to amend. *Jung*, 356 U.S. at 336. More than a year after the second twenty days elapsed, and without having filed an amended complaint, the plaintiffs "filed an instrument in the case by which they elected to stand on their first amended complaint," prompting the district court to enter its third order, dismissing the entire "action." *Id*. The defendants moved to dismiss the appeal as filed too late as measured from the second dismissal order—the district court's denial of reconsideration.

The Supreme Court in *Jung* held that earlier, unappealed order did not constitute a "final judgment" under Federal Rule of Civil Procedure 58 because it anticipated "further proceedings 'either by amendment of the [complaint] or entry of a final judgment.'" *Id.* at 337. It was the third order, from which plaintiffs had timely appealed, that finally dismissed the case when it "directed 'that all relief be denied' and required 'the clerk [to] enter judgment.'" *Id*. (quoting Fed. R. Civ. P. 58 (1946), *reprinted in* 28 U.S.C. § 723c app. at 3318 (1946)). The order from which plaintiff appealed in this case, by contrast, showed by its terms and context that the case stood dismissed when the Butterfly Association appealed.

In any event, *Jung* and Rule 58 do not control our jurisdictional inquiry. *Jung* focuses on "what constituted the final judgment in the case," *id*., in terms that appear to speak to Rule 58's separate-document requirement, *id*. (referring to Rule 58), which is not itself jurisdictional. Indeed, the *Jung* opinion never even cites section 1291 nor mentions jurisdictional finality. This court has never cited *Jung* in our ample finality jurisprudence; neither, notably, has the Supreme Court. And the Supreme Court has since held that Rule 58, which prescribes how civil judgments must be documented, need not necessarily be satisfied for a decision to be considered final and appealable under section 1291. *See Mallis*, 435 U.S. at 384 & n.4, 385. More recently still, the Federal Rules were amended in 2002 to clarify that, even when a district court making a final decision under section 1291 fails separately to document the judgment as Rule 58 prescribes, judgment is deemed entered 150 days thereafter and any appeal taken within that 150-day period is timely. *See* Fed. R. Civ. P. 58(c)(2)(B); Fed. R. App. P. 4(a)(7); *Outlaw v. Airtech Air Conditioning & Heating, Inc.*, 412 F.3d 156, 163 (D.C. Cir. 2005). *Jung*'s construction of Rule 58—which preserved rather than defeated appellate jurisdiction—poses no conflict with our recent decisions, including this one, expressly deciding the circumstances under which a dismissal without prejudice is final under section 1291.

There is some disagreement among the circuits over whether and when a without-prejudice dismissal with time-limited leave to amend becomes final under section 1291. *Compare, e.g.*, *Otis v. City of Chicago*, 29 F.3d 1159, 1167 (7th Cir. 1994) (en banc) (holding a dismissal is always final once leave expires), *and Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1260 (11th Cir. 2006) (holding that a dismissal can be final even before leave to amend expires), *with, e.g.*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en

banc) (holding that finality requires a further order of dismissal upon expiration of leave to amend). But because the district court's intent here is clear, we need not spell out other circumstances in which a further order might be needed to signal finality. All we decide is that this appeal, taken after expiration of the minute order's time-limited opportunity to amend, and appealing from the judge's dismissal order and accompanying opinion that unambiguously dismissed the entire "case" and all "claims," addresses a final decision of the district court and therefore falls within our jurisdiction under section 1291—without the need for the plaintiff to request and obtain a further order from the district court. *Contra WMX Techs.*, 104 F.3d at 1136 (requiring a further district court order).

Our disagreement with the dissent is narrow. We agree that we look to the dismissal order, doing our best in light of the order's terms and context to discern the district judge's intention. Diss. Op. at 4-6. We, like the dissent, leave control over its proceedings in the district court's hands. *Id*. at 29 & n.7. Again, the dismissal order here rejects the "claims," not just the "complaint." *See FirsTier Mortg. Co. v. Invs. Mortg. Ins. Co*, 498 U.S. 269, 277 (1990) (describing as tending to support finality the purported disposition by bench ruling of "all" of FirsTier's "claims"). And the reasoning in the accompanying opinion—which announced that the entire "case" was dismissed—well explains the effect of the judge's order. *See St. Marks Place Hous. Co., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 80 (D.C. Cir. 2010) (construing finality of dismissal order to crystalize upon issuance of ensuing opinion). We see grounds here for further merits litigation, *see infra*, at 34-38; *see also* Diss. Op. at 8, but nothing in the district court's memorandum opinion and order suggested that court expected the case could be rescued through better pleading.

The separate minute order is not to the contrary. The court's allowance of fourteen days for amendment appears to have been a routine and appropriate exercise of judicial modesty and efficiency. By recognizing that a plaintiff might see a valid avenue for correction even where it does not, a district court can prevent unnecessary appeals. That approach is in keeping with the "practical rather than a technical construction" of finality under 28 U.S.C. § 1291, geared toward avoiding "protracted litigation and piecemeal appeals." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1712-13 (2017). If the unsolicited minute order confused either party, it could have asked the court to separately document the judgment, *see* Fed. R. Civ. P. 58(d)—a step that, although available and sometimes useful, is not required. It is because our dissenting colleague reads the minute order as supplanting, rather than complementing, the district court's memorandum opinion and order that she views our decision as contrary to *Attias*. *See* Diss. Op. at 4-5. Perhaps the district court could have been clearer. But we, like the parties, think it was clear enough.

We also agree with the dissent that the issue here would have been obviated altogether had the district court entered another order dismissing the case on the expiration of the fourteen-day amendment period. Diss. Op. at 18. But we disagree that "some further action from the district court is needed" to confirm the final judgment in every case in which leave to amend is granted. *Id.* Instead, on a plaintiff's timely appeal without amendment, we credit the district court's dismissal of the "case" and all "claims" as signaling an end to the district court's involvement in the case. The district court's provision for a clearly circumscribed window to amend did not, contrary to the dissent's assertions, *id.* at 18, 21, 22, 29, take finality out of the court's hands. The date a paper is filed is not always and necessarily the date the order it embodies becomes

19

final and appealable, *see generally, e.g.*, *St. Marks Place*, 610 F.3d at 80; Fed. R. Civ. P. 58(c)(2)(B); Fed. R. App. P. 4(a)(7)(A)(ii), (B); *contra* Diss. Op. at 23 (an order is final "when it hits the docket"), and we see no bar to a district court order setting finality at an identified future date. On this record, "nothing but delay would flow" from the dissent's favored approach: "Upon [our] dismissal [of this appeal], the district court would simply file and enter the separate judgment, from which a timely appeal would then be taken. Wheels would spin for no practical purpose." *Mallis*, 435 U.S. at 385.

In addition to confirming that the district court decision under review is "final," we must also ensure this appeal is timely. Here, that means the Butterfly Association must have appealed within sixty days of the "entry" of the "judgment" or "order" setting forth the final decision. 28 U.S.C. § 2107(b)(3). Here, too, we must respect the district court's power to determine when and precisely how it decides its cases. *See St. Marks Place*, 610 F.3d at 80 ("[D]istrict courts can choose when to decide their cases."). It would seem most consistent with the intent of the district court here to view its order as final as of the date the specified time to file any amended complaint expired. But because this appeal is unquestionably timely even if the judgment were treated as final on the date the underlying order was filed, we need not decide the precise date of entry. This is no "cliffhanger," Diss. Op. at 1, but the familiar incrementalism of an Article III court applying binding law to decide the case before it. We hold that the Butterfly Association timely appealed from a final decision, affording us jurisdiction under 28 U.S.C. §§ 1291 and 2107(b)(3).

### B. Article III Standing & Mootness

We next consider whether the Butterfly Association has standing, and whether its claims are mooted by the Appropriations Acts' prohibitions against funding any border fencing at the National Butterfly Center. DHS contends that no actual, ongoing controversy exists because the Butterfly Association has itself taken the position that the 2019 and 2020 Appropriations Acts prohibit using federal funds to construct "fencing" at the Center. 2019 Appropriations Act § 231(4); 2020 Appropriations Act § 210(4). Specifically, DHS contends that those appropriations bills—at least as the plaintiff reads them—destroy the Association's standing to obtain prospective injunctive relief and moot whatever actual controversy once existed.

DHS' standing argument is misplaced because "the standing inquiry focuses on whether the plaintiff has demonstrated an injury 'at the outset of the litigation,'" so post-filing developments like the 2019 and 2020 Appropriations Acts do not undercut standing. *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 977 (D.C. Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*, 528 U.S. 167, 180 (2000)). DHS does not dispute that the Butterfly Association "alleged a live controversy when it first filed suit," Appellees' Br. 30, and our review of the complaint confirms as much, *see* Am. Compl. ¶¶ 53, 56-60, 62 (J.A. 33-35). There is no standing defect here.

DHS' objection is more aptly framed in terms of mootness, which focuses on "whether events subsequent to the filing of the complaint 'have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Hardaway*, 843 F.3d at 978 (quoting *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011)). Defendant DHS bears

"the initial burden of proving" that no live controversy exists. *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019). Attempting to carry that "heavy burden," *Hardaway*, 843 F.3d at 979 (quoting *Laidlaw*, 528 U.S. at 189), DHS insists that the Butterfly Association "interprets the [2019] Appropriations Act to prevent the construction of a wall on its property," Appellees' Br. 30.

DHS invokes but, critically, does not itself embrace the Butterfly Association's interpretation of the funding limitations. In fact, the current restriction against using appropriated federal funds to construct "fencing" at the National Butterfly Center does not conclusively put an end to all of CBP's challenged conduct. The 2019 and 2020 Appropriations Acts identify fence construction as distinct from widening roads or installing sensors. Specifically, they continue to fund "the acquisition and deployment of border security technologies and trade and travel assets and infrastructure" separately from construction of a "barrier system" and "pedestrian fencing." *Compare* 2020 Appropriations Act § 209(a)(2), *and* 2019 Appropriations Act § 230(a)(2), *with* 2020 Appropriations Act § 209(a)(1), *and* 2019 Appropriations Act § 230(a)(1). DHS does not even argue that, in view of the appropriations restrictions, it will cease all of the challenged activities on the Center's land. *See* Am. Compl. ¶¶ 53, 59 (J.A. 33). It does not disclaim current authority to install sensors, alter roads, or maintain a continuous physical presence at the National Butterfly Center—activities the complaint squarely challenges in addition to the border-wall construction itself. *See id.* ¶¶ 53, 57, 59 (J.A. 33-34).

Because DHS has neither ceased the conduct that the Butterfly Association challenges nor professed any intent to cease, it has not made "absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur." *Hardaway*, 843 F.3d at 979 (quoting *Laidlaw*, 528 U.S. at 189). Without any admission on DHS' part that the Appropriations Acts foreclose its activities or other disavowal of its previously stated plans, nor any basis to conclude that DHS has withdrawn its active presence at the National Butterfly Center, *see* Reply Br. 10; Oral Arg. Tr. 64:19-65:7, we cannot declare the claims moot. We therefore conclude that DHS "has not met th[e] high bar" to show that this appeal is moot. *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016).

## C. IIRIRA's Jurisdiction-Stripping and Review-Channeling Provisions

DHS contends that IIRIRA section 102(c)(2) applies here to deprive us of jurisdiction by wholly eliminating federal court review of the Butterfly Association's statutory claims, and confining to the Supreme Court any review of the district court's decisions on the constitutional claims. Section 102(c)(2)(A) eliminates district courts' jurisdiction over all non-constitutional "causes and claims arising from any action undertaken, or any decision made," by the DHS Secretary to waive under IIRIRA section 102(c)(1) legal requirements that would otherwise apply to border-infrastructure projects. IIRIRA § 102(c)(2)(A). And, whereas section 102(c)(2)(A) allows district courts to exercise jurisdiction over constitutional claims "arising from" the Secretary's waiver authority, it channels review of those decisions directly to the Supreme Court on writ of certiorari, bypassing the courts of appeals. *See id.* § 102(c)(2)(C). The district court concluded that the Butterfly Association's statutory claims arose from the Waiver Determination and dismissed those claims for lack of jurisdiction, even as it noted in passing that the Waiver Determination provided the government a valid defense. *See Butterfly Ass'n*, 368 F. Supp. 3d at 8-10. It dismissed the

constitutional claims as legally noncognizable. *See id*. at 6-8. The government defends both dispositions.

Both of the jurisdictional questions here—whether section 102(c)(2)(A) supported the district court's dismissal of the statutory claims for want of jurisdiction, and whether section 102(c)(2)(C) channeled any effort at further review directly to the Supreme Court, bypassing this court—depend on whether the respective claims "aris[e] from" the Waiver Determination that the DHS Secretary issued some ten months after the Butterfly Association sued DHS. IIRIRA § 102(c)(2)(A). To assess the scope of the term "arising from," "we look to the 'traditional tools of statutory interpretation— text, structure, purpose, and legislative history.'" *In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019) (quoting *Tax Analysts v. IRS*, 350 F.3d 100, 103 (D.C. Cir. 2003)). Because section 102(c)(2)(A) wholly eliminates some federal court jurisdiction, our statutory analysis must account for "the strong presumption that Congress intends judicial review of administrative action." *Am. Clinical Lab. Ass'n v. Azar*, 931 F.3d 1195, 1204 (D.C. Cir. 2019) (quoting *Smith v. Berryhill*, 139 S. Ct. 1765, 1776 (2019)); *accord Make the Road N.Y. v. Wolf*, 962 F.3d 612, 623-24 (D.C. Cir. 2020); *In re Border Infrastructure*, 915 F.3d 1215, 1222 n.10 (9th Cir. 2019). We thus construe § 102(c)(2)(A)'s "arising from" language "narrowly." *Am. Clinical*, 931 F.3d at 1204.

Notably, the jurisdiction-stripping provision, section 102(c)(2)(A), applies only to claims "arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1)"—the paragraph that authorizes the Secretary to waive statutory requirements for border projects. IIRIRA § 102(c)(2)(A). By its terms, it does not extend to construction or related activities that do not

necessarily flow from exercise of the waiver authority as such, but that IIRIRA section 102(a)-(b) authorizes independently.

The parties agree that our understanding of IIRIRA's "arising from" language should draw on interpretation of the same text in another jurisdiction-stripping immigration provision, which deprives courts of jurisdiction over any claim "arising from" the Attorney General's alien-removal decisions or orders. 8 U.S.C. § 1252(g). Courts interpreting the removal provision have held that "we would defy logic by holding that a claim for relief somehow 'aris[es] from' decisions and actions accomplished only after the injury allegedly occurred." *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 944 (5th Cir. 1999) (alteration in original) (quoting 8 U.S.C. § 1252(g)); *accord Kwai Fun Wong v. United States*, 373 F.3d 952, 965 (9th Cir. 2004). Accepting that an act can only "aris[e] from" circumstances that precede it, we conclude that claims challenging CBP's alleged incursions onto the National Butterfly Center's property did not "aris[e] from" a Waiver Determination issued well after the alleged incursions (and, indeed, not until some ten months after the Butterfly Association filed its original complaint). Regardless whether the Waiver Determination affords a defense to the Association's claims, *see* Part III.A *infra*, it did not give rise to them. Our statutory analysis accords with that of the Ninth Circuit, which assessed the same "arising from" language in IIRIRA section 102(c)(2)(A) and exercised jurisdiction over an appeal challenging border-wall construction for which the DHS Secretary had issued waivers under section 102(c)(1), including some issued only after the plaintiffs had filed suit. *See Border Infrastructure*, 915 F.3d at 1220-22.

The meaning of "arising from" in other areas of law confirms that the Butterfly Association's claims cannot "aris[e] from" a post-claim event like the Waiver Determination. For

example, the Ninth Circuit analogized to the "black letter law of federal question jurisdiction" reflected in the well-pleaded complaint rule to explain that, just as a claim does not arise under federal law simply because it is susceptible to a federal-law defense, claims do not "'aris[e] from' the Secretary's waiver determinations merely because those waivers could provide the Secretary with a viable defense." *Id*. at 1221-22 (alteration in original) (quoting IIRIRA § 102(c)(2)(A)). To similar effect, we recently reiterated in construing a contractual forum-selection clause that the phrase "arising out of" sweeps less broadly than "in connection with" or "in relation to." *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 878 (D.C. Cir. 2019); *see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074-75 (3d Cir. 1997) (Alito, J.). Because "'arise' out of means 'to originate from a specified source,'" *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (Sotomayor, J.) (quoting Webster's Third New International Dictionary 117 (1986)), the phrase "arising out of" generally requires "a causal connection," *id.*, not merely a "logical" one, *Azima*, 926 F.3d at 877 (quoting *John Wyeth*, 119 F.3d at 1074).

Without reason to believe the meaning of IIRIRA's "arising from" should differ from the ordinary understanding of "arising out of" in other contexts, we read section 102(c)(2) to eliminate jurisdiction only for those claims that "originate[] or stem[] from" the Waiver Determination. *Border Infrastructure*, 915 F.3d at 1220. The Butterfly Association's claims predate and do not depend on the DHS Secretary's Waiver Determination, so do not "aris[e] from" the DHS Secretary's waiver authority.

DHS points to legislative history expressing Congress's intent that section 102(c)(2) facilitate "expeditious construction of border security infrastructure." Appellees'

Br. 26 (quoting H.R. Rep. No. 109-72, at 172 (2005)). But the apparent purpose to hasten construction cannot "be used to 'muddy' the meaning of 'clear statutory language'" like section 102(c)(2)'s specific cross-reference to section 102(c)(1) rather than to section 102 as a whole. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011)). Section 102(c)(2)(A) has the intended effect of aiding expedition only to the extent its text commands—by eliminating judicial review of claims flowing from a waiver decision. "[P]olicy arguments" about the assertedly dilatory effect of judicial review the text leaves undisturbed cannot "overcome the statute's plain language, which is our primary guide to Congress' preferred policy." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017) (internal quotation marks omitted). Our reading of the statute gives full effect to Congress' expressed interest in stripping federal-court jurisdiction and channeling review over claims "arising out of" the Secretary's exercise of waiver authority.

We accordingly hold that we have jurisdiction over this appeal. We are satisfied that the district court's jurisdiction over the Butterfly Association's statutory claims was not stripped by section 102(c)(2)(A), nor is review of the dismissal of the statutory and constitutional claims channeled by section 102(c)(2)(C) directly to the Supreme Court. Insofar as plaintiffs challenge actions that predate the waiver, the statutory limitations on the courts' jurisdiction do not apply. We thus need not reach the Butterfly Association's alternative jurisdictional argument that, if the statute purported to bar our review, we nonetheless would have jurisdiction on the ground that the Waiver Determination was *ultra vires*. *See, e.g.*, *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 508-09 (D.C. Cir. 2019). We return to the *ultra vires* argument in a moment in connection with the government's asserted Waiver-

Determination-based defense to the NEPA and ESA claims, the viability of which depends on the Association's challenges to the Waiver Determination itself.

## III. MERITS

We now turn to the merits of the district court's dismissal of the Butterfly Association's statutory and constitutional claims. *See Butterfly Ass'n*, 368 F. Supp. 3d at 7-8, 10. The Association contends that, in preparing for and starting to construct the border wall, defendants have entered onto, commandeered, and damaged the Association's private property on which the Association maintains, among other things, its Butterfly Center and endangered-species habitats. *See* Am. Compl. ¶¶ 53-62 (J.A. 33-35). The Association claims that the government has breached its statutory obligations under the National Environmental Policy Act and the Endangered Species Act and violated the Association's possessory rights protected by the Fourth and Fifth Amendments to the Constitution. *See id.* ¶¶ 63-89 (J.A. 35-38). We hold that the Secretary's Waiver Determination defeats the statutory claims, that the Butterfly Association has failed to state a Fourth Amendment claim of unreasonable seizure of property it acknowledges to be "open fields," but that the Association has stated a procedural due process claim under the Fifth Amendment.

### A. Statutory Claims

The Secretary's Waiver Determination "waive[s] in their entirety . . . legal requirements of, deriving from, or relating to the subject of" various statutes, including the NEPA and ESA, that could otherwise apply to border-wall construction and related border-security measures occurring in a project area that includes the National Butterfly Center. Waiver Determination, 83 Fed. Reg. at 51,473. The Butterfly

Association does not dispute that the Waiver Determination, if lawful and effective, defeats its NEPA and ESA claims. Those familiar environmental statutes require preparation of an environmental impact statement in connection with "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C) (NEPA), and interagency consultation to ensure that agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species" or its habitat, 16 U.S.C. § 1536(a)(2) (ESA).

The Butterfly Association raises two arguments that those claims survive the Secretary's Waiver Determination. First, it contends that the Waiver Determination was *ultra vires* as issued—meaning it was "a 'patent violation of agency authority.'" *Am. Clinical*, 931 F.3d at 1208 (quoting *Indep. Cosmetic Mfrs. & Distribs., Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 574 F.2d 553, 555 (D.C. Cir. 1978)). Second, it argues that the funding restrictions in the 2019 and 2020 Appropriations Acts render the Waiver Determination ineffective as to the Butterfly Center.

**1.** "*Ultra vires* review 'is intended to be of extremely limited scope,' and it 'represents a more difficult course than would review under the [Administrative Procedure Act (APA), 5 U.S.C. § 706].'" *Id.* (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (alteration omitted)). The Butterfly Association's *ultra vires* claim hinges on its contention that the Secretary failed to comply with the nondiscretionary consultation requirement of IIRIRA section 102(b)(1)(C)(i) before exercising her authority under section 102(c)(1) to waive legal requirements derived from the NEPA and the ESA.

The statute the Association invokes as requiring pre-waiver consultation provides in full:

> In carrying out this section, the [DHS Secretary] shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

IIRIRA § 102(b)(1)(C)(i). The Association acknowledges that DHS published its construction plans and sought public comment in advance of issuing the Waiver Determination in mid-October 2017, but contends that the statute required the Secretary to do more than what the Association characterizes as having merely gone through "the motions of consulting" with stakeholders. Appellant's Br. 48. The Association argues that a more procedurally and substantively robust level of stakeholder engagement before beginning border-construction work is essential to fulfill the purpose of the pre-waiver consultation requirement and to provide some protection for the interests otherwise served by advance consultation and study under the waived statutes (including the NEPA and ESA).

For purposes of its *ultra vires* claim, however, the Butterfly Association has not established that the pre-waiver consultation DHS conducted fell so far short as to render it *ultra vires*. In casting DHS' consultation as too narrow, the Association has not shown that its scope violated "a specific prohibition in the statute that is clear and mandatory," *DCH Reg'l*, 925 F.3d at 509 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)), was "obviously beyond the terms of the statute," *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Human Servs.*, 830 F.3d 515,

522 (D.C. Cir. 2016), or was "far outside the scope of the task that Congress gave it," *Am. Clinical*, 931 F.3d at 1208, as would be necessary to invalidate the Waiver Determination as *ultra vires*.

**2.** The Butterfly Association alternatively argues that the Waiver Determination no longer applies to the Butterfly Center in light of Congress's decisions in the 2019 and 2020 Appropriations Acts to defund border-wall construction at the Center.

The Association reads the Appropriations Acts' funding prohibition to prevent "any and all forms of new construction, including walls, barriers, roads, enforcement zones, and artificial lighting," on its premises. Appellant's Br. 40-41. On that reading, we note that there would not appear to be authorization for any "major Federal actions significantly affecting the quality of the environment," 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18, or "agency action," 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02, sufficient to bring the NEPA or ESA into play. *See* Part II.B *supra* (non-mootness). Indeed, the Association acknowledged at oral argument that, if its understanding of the reach of the Appropriations Acts' funding restrictions were correct, its NEPA and ESA claims would fall away. *See* Oral Arg. Tr. 25:18-25.

More to the point, the Waiver Determination is framed to sweep aside NEPA's and ESA's application not just to "fencing" but more generally to the "construction of roads and physical barriers," including installation of "safety features, lighting, cameras, and sensors" to which the Butterfly Center objects. 83 Fed. Reg. at 51,473. That Determination thus operates to defeat on its merits the Association's claim that the NEPA and ESA apply to CBP border security activity at the

Butterfly Center that was not eliminated by the 2019 and 2020 Appropriations Acts' defunding of border fencing.

In sum, as to the Butterfly Association's statutory claims, we hold that the district court erred in dismissing them for lack of subject-matter jurisdiction under IIRIRA section 102(c)(2)(A), but we credit the district court's suggestion that those claims are defeated on their merits by the Waiver Determination. *See Butterfly Ass'n*, 368 F. Supp. 3d at 8. The Waiver Determination is neither *ultra vires* nor rendered inapplicable by the 2019 and 2020 Appropriations Acts. We thus affirm dismissal of the NEPA and ESA claims for failure to state a legally viable claim on which relief can be granted. *See, e.g.*, *St. Francis Xavier*, 117 F.3d at 624.

**B.   Constitutional Claims**

There is no dispute that the Waiver Determination is inapplicable to the Butterfly Association's constitutional claims. *See* 83 Fed. Reg. at 51,473-74; *Butterfly Ass'n*, 368 F. Supp. 3d at 6 n.2. We accordingly review on their merits the government's contentions that the Butterfly Association lacks the asserted constitutional protections against the claimed occupation and use of its property.

**1.   Fourth Amendment Seizure Claim**

The Butterfly Association asserts a Fourth Amendment claim of "unreasonable seizure of its property," Appellant's Br. 19, but because it admits that the Butterfly Center is an "open field[]," Reply Br. 12-13, its claimed interest against seizure—whether cast in privacy or possessory terms—is unprotected by the Fourth Amendment. "The Fourth Amendment 'indicates with some precision the places and things encompassed by its protections'" against unreasonable searches and seizures; what it speaks of are "persons, houses,

papers, and effects." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)). At its "very core," the Fourth Amendment protects the inside of a home, *id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)), and its home protection has been held to extend to "curtilage"—the outdoor area "immediately surrounding and associated with the home," *id.* (quoting *Oliver*, 466 U.S. at 180). But "open fields" beyond the curtilage of a home, whether or not privately owned, are not among the protected places and things "enumerated in the Amendment's text," so they fall outside the Fourth Amendment's coverage. *Id.* The Supreme Court in *Oliver* provided an additional justification beyond the Fourth Amendment's enumeration for considering "open fields" outside the Amendment's scope: "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields." 466 U.S. at 178.

The Association acknowledges the lack of a constitutionally protected "privacy interest" in an open field, but asserts that its "possessory interest" in the National Butterfly Center's grounds suffices to support a Fourth Amendment seizure claim. Appellant's Br. 18. That claim runs up against the same obstacle that would defeat a privacy-based claim: Open fields are not among the "places and things" the Fourth Amendment protects—whether from infringements of privacy or possession. *Jardines*, 569 U.S. at 6. To be sure, the Supreme Court recognized in *Soldal v. Cook County* that its cases "unmistakably hold that the [Fourth] Amendment protects property as well as privacy," 506 U.S. 56, 62 (1992), and that it shields against "seizures" as well as "searches," *id.* at 63 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). In the same breath, however, the Court cautioned that the Fourth Amendment "does not protect possessory interests in all kinds of property," *id.* at 62 n.7, with a lone citation to *Oliver*, in which the Court had held that "open fields" are not

part of the "house" or among the "effects" the privacy of which the Fourth Amendment protects, *Oliver*, 466 U.S. at 176-77. We thus read the *Soldal* footnote to imply that open fields fall beyond the Fourth Amendment's protection of possessory as well as privacy interests. That implication gains further (albeit indirect) support in the Court's recent declaration that, "[q]uite simply, an open field, unlike the curtilage of a home, is not one of those protected areas enumerated in the Fourth Amendment." *United States v. Jones*, 565 U.S. 400, 411 (2012) (citation omitted). Recognizing the lack of precedent directly on point, we hold that the alleged seizure of the Butterfly Center's open fields is not cognizable under the Fourth Amendment.

The Butterfly Association frames its Fourth Amendment claim as contesting only a seizure of its open fields. We need not, and do not, consider the potential viability of distinct Fourth Amendment claims that a private party might assert in similar circumstances. We do not, for example, pass on whether continuous monitoring by sensors or CBP officers in person on Center premises might violate the Association's reasonable expectation of privacy and therefore amount to a Fourth Amendment search, *cf. Carpenter v. United States*, 138 S. Ct. 2206, 2217-19 (2018), or whether destruction, disturbance, or occupation of botanical gardens, landscaping, or other fixtures or improvements at the Center might count as seizure of Fourth Amendment-protected "effects," *cf. Oliver*, 466 U.S. at 177 & n.7. Because the Butterfly Association does not seek relief pursuant to the Fourth Amendment that it does not also seek under the Fifth Amendment, *see* Oral Arg. Tr. 9:21-24, we need not now venture into those relatively uncharted Fourth Amendment waters. We therefore affirm the dismissal of the Fourth Amendment claim.

### 2. Fifth Amendment Claim

The Fifth Amendment extends certain protections distinct from and in some respects broader than those granted by the Fourth. By its terms, the Fifth Amendment prohibits the federal government from depriving any person "of life, liberty, or property, without due process of law," and from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V. Because it lacks the kind of specific enumeration appearing in the Fourth Amendment, the Fifth applies to private property more generally. *See, e.g.*, *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 51-52 (1993). We hold that the complaint states a Fifth Amendment procedural due process claim based on DHS' allegedly unauthorized occupation and use of the Butterfly Association's land.

On appeal, the Butterfly Association has disclaimed seeking "recovery for a taking," Reply Br. 26, so we consider only its due process claim. The Due Process Clause affords both substantive and procedural protections. *See, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). The Butterfly Association contends that DHS violated both, but the Association failed to press or even mention substantive due process in the district court. We thus treat any substantive due process claim as forfeited and limit our Fifth Amendment analysis to the procedural due process claim.

A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections—protections that include, at minimum, the basic requirements of notice and an opportunity to be heard. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976). As a threshold matter, DHS contends that the procedural due

process claim is unripe because the Butterfly Association "acknowledge[s] that the federal government has not [yet] sought to acquire an interest in [the National Butterfly Center] 'or followed any of the steps for doing so.'" Appellees' Br. 16 (quoting Am. Compl. ¶ 83 (J.A. 38)); *see also Butterfly Ass'n*, 368 F. Supp. 3d at 8. But a deprivation occurs by virtue of the government's assertion of control, so a procedural due process claim may be ripe without the government having formally sought or acquired any property interest. Indeed, a principal focus of procedural due process protection is the adequacy of governmental process "before the owner is finally deprived of a protected property interest." *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982)).

The Butterfly Association alleges that CBP has asserted control over the National Butterfly Center by entering, maintaining a regular presence on, and taking charge of areas of the Center without notice to or consent from the Association. *See* Am. Compl. ¶ 62 (J.A. 35). The complaint alleges that CBP installed sensors at the Center to detect aboveground activity, widened private roadways within the property, cut down trees, and threatened to destroy the Association's private gates and locks without warning. *See id*. ¶¶ 53, 59-60 (J.A. 33-34); *see also, e.g.*, Fourth Wright Decl. ¶¶ 4-9 (J.A. 698-700) (averring that such intrusions continued into February 2019). Those property deprivations are unexcused, the complaint alleges, by any citation on DHS' part to a "lawful basis for their intrusion and destruction of" the Butterfly Center or any effort by DHS to "acquire an interest" in property admittedly not its own through any legally recognized "steps for doing so." Am. Compl. ¶ 83 (J.A. 38). In light of the alleged current and imminent property deprivations, we are unpersuaded by DHS' submission that its failure to take steps formally to acquire a property interest in the National Butterfly

Center prevents the Butterfly Association from asserting a property-deprivation claim under the Fifth Amendment.

We also reject DHS' defense that its statutory authority to patrol the border means that the Butterfly Association has failed to identify a property deprivation. To be sure, if all the alleged intrusions count as routine border patrol, there is no property deprivation for which the Association claims a due process denial. Federal law privileges CBP officers to enter the Center's premises to "patrol[] the border" by conducting "activities [that] are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c); *see also* 8 U.S.C. § 1357(a)(3). And the Association does not challenge that statutory "license to patrol the Butterfly Center." Reply Br. 22.

The due process claim survives because the government has not established that its statutory authority to enter private property to patrol the border licenses all of the alleged intrusions at the Center. For example, DHS has not argued that the contractors it allegedly employed to widen a private road at the Center, *see* Am. Compl. ¶¶ 53, 55 (J.A. 33), are "immigration officers" entitled "to exercise the power to patrol the border conferred by [8 U.S.C. § 1357(a)(3)]" by entering private property, 8 C.F.R. § 287.5(b). Nor has it established that widening private roadways, installing sensors, or regularly stationing CBP agents on Center property, *see* Am. Compl. ¶¶ 53, 59, 62 (J.A. 33-35), all fall within the statutory authorization for "patrolling the border," 8 C.F.R. § 287.1(c), or justify entry onto private property under section 1357(a)(3).

Seeking to fit at least the installation of sensors within its customary border-patrol authority, DHS cites two decades-old criminal cases that describe CBP's use of sensors on highways near the border to detect individual crossings. *See United*

*States v. Aguirre-Valenzuela*, 700 F.2d 161, 162 & n.3 (5th Cir. 1983) (per curiam) (referring to two "loop-type[]" vehicle sensors located approximately ten miles apart across a dirt road and a state highway); *United States v. Mora-Chavez*, 496 F.2d 1181, 1182 (9th Cir. 1974) (referring only generally to "electronic sensors which detect human foot traffic across the border"). But DHS provides no authority that installing multiple sensors on private property without advance notice or the landowner's consent counts as a "customary[] or reasonable and necessary" activity of "patrolling the border" to prevent unauthorized immigration. 8 C.F.R. § 287.1(c). Indeed, in implementing Executive Order No. 13,767, the DHS Secretary described the installation of "sensors" as "attendant" to new border-wall construction, not as a customary border-patrol activity. DHS Memo at 5 (J.A. 415). We cannot conclude at this stage that the challenged installation of sensors and other infrastructure or support for border surveillance rests on the same legal authority as traditional border patrol.

With allegations that government officials and contractors have entered the National Butterfly Center to alter private roadways and install sensors, and that CBP has maintained an enduring presence at the Center in connection with planned border-security infrastructure, the Butterfly Association plausibly pleads a deprivation of property without due process. At the pleading stage, we of course express no view as to whether DHS agents in fact behaved as the Butterfly Association has alleged or whether the Association's Fifth Amendment procedural due process claim will ultimately prevail.

Finally, DHS makes a fleeting assertion that the Fifth Amendment claim is fatally defective for failure to identify the procedural safeguards the Butterfly Association claims the government should have observed. While "stat[ing] a

procedural due process claim" typically requires "suggest[ing] 'what sort of process is due,'" *Elkins v. District of Columbia*, 690 F.3d 554, 561 (D.C. Cir. 2012) (quoting *Doe ex rel. Fein v. District of Columbia*, 93 F.3d 861, 869 (D.C. Cir. 1996)), DHS forfeited that ground for dismissal by failing to raise it in the district court, *see, e.g.*, *Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).

In short, DHS' arguments do not defeat the Butterfly Association's Fifth Amendment procedural due process claim, so we reverse dismissal of that claim and remand for further proceedings consistent with this opinion.

\* \* \*

To sum up our disposition, we conclude that we and the district court have jurisdiction to consider the Butterfly Association's claims, but that the two statutory claims fail on their merits. We thus affirm their dismissal under Rule 12(b)(6) rather than Rule 12(b)(1). We also affirm dismissal of the Butterfly Association's Fourth Amendment claim under Rule 12(b)(6). We reverse dismissal of the Butterfly Association's Fifth Amendment procedural due process claim and remand for further proceedings consistent with this opinion.

*So ordered*.

MILLETT, *Circuit Judge*, dissenting: Cliffhangers may make for good storytelling, but they are no good for establishing appellate jurisdiction. Because the district court dismissed the complaint in part without prejudice and with express leave to amend and to seek emergency injunctive relief, and then did nothing more to conclude the case, we lack jurisdiction over this appeal.

The majority opinion offers a thoughtful theory of jurisdiction. The problem is that the Supreme Court has already answered this same jurisdictional question the opposite way. That decision binds this court. And the Supreme Court's disposition should come as no surprise. Statutory text, structure, and established principles of appellate jurisdiction foreclose our review because the district court's dismissal of the complaint was by its plain terms not final when entered by the court. The mere passage of time, without more, could not by itself make the judgment final. Neither could the litigants, through their actions or inaction, step into the shoes of the district court and singlehandedly cause the entry of a final judgment in the case. Without jurisdiction, we lack the power to address the merits. For that reason, I respectfully dissent.

**I**

The North American Butterfly Association filed a notice of appeal of "all aspects of the order" by the district court "entered on February 14, 2019, granting defendants' motions to dismiss," citing "ECF 46[.]" Notice of Appeal, *North American Butterfly Ass'n v. Nielsen*, No. 1:17-cv-02651-RJL (D.D.C. March 4, 2019), ECF No. 47. That order as recorded in ECF 46 states, as relevant here: "[D]efendants' motions to dismiss * * * are granted, plaintiff's constitutional claims are dismissed without prejudice, and plaintiff's statutory claims are dismissed with prejudice." Order, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. Feb. 14, 2019). The referenced "motions to dismiss," *id*., requested dismissal of the

Butterfly Association's "Complaint." Motion to Dismiss at 1, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. May 25, 2018), ECF No. 25; Defendants' Supplemental Motion to Dismiss at 2, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. Nov. 5, 2018), ECF No. 34.[1]

Key to the jurisdictional question in this case is the accompanying minute order the district court entered that same day and recorded as part and parcel of the ECF 46 dismissal decision. The minute order first denied as moot the Butterfly Association's motion for a temporary restraining order and preliminary injunction. Minute Order, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. Feb. 14, 2019). The minute order also provided that, "[i]n light of the Court's February 14 Memorandum Opinion and Order dismissing plaintiff's Amended Complaint," it is

> ORDERED that [the Butterfly Association] shall have leave to file a second amended complaint and renewed request for emergency injunctive relief, if any, within 14 days of the date of this Order. Any such filings shall consider the effect of the Court's February 14 Memorandum Opinion and Order on [the Butterfly Association's] claims.

*Id.*

---

[1] I agree with the majority opinion that, because the district court ruled that it lacked jurisdiction over the statutory claims, as a matter of law those too should have been dismissed without prejudice. Majority Op. 12; *see Havens v. Mabus*, 759 F.3d 91, 98 (D.C. Cir. 2014) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001)).

The Butterfly Association did not file an amended complaint. Nor did it inform the court that it would not be filing an amended complaint or new request for injunctive relief. Instead, the Butterfly Association filed a notice of appeal eighteen days later from the order "granting the defendants' motions to dismiss (ECF 46[)]"—that is, from the order dismissing the complaint in part without prejudice and with leave to file an amended complaint and seek further relief. Notice of Appeal, *North American Butterfly*, No. 1-17-cv-02651-RJL (D.D.C. Feb. 14, 2019), ECF No. 47.

To date, the district court has not entered an order converting its dismissal without prejudice of the constitutional claims to a dismissal with prejudice. Nor has it entered a formal judgment or otherwise finalized its decision. And so the district court's order inviting an amended complaint and application for injunctive relief remain the last entries on the docket preceding this appeal.

## II

The threshold question in this case—as in every case—is whether we have jurisdiction. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); *CTS Corp. v. EPA*, 759 F.3d 52, 57 (D.C. Cir. 2014) ("This court, as a matter of constitutional duty, must assure itself of its jurisdiction to act in every case."). Because the district court never entered an appealable final order denying all relief in the case, and no other source of appellate jurisdiction applies, we do not have jurisdiction.[2]

---

[2] While the district court also denied as moot the Butterfly Association's motion for a preliminary injunction, the Butterfly Association did not appeal that aspect of the order. Its notice of appeal is explicit that it is challenging only the order "granting

4

**A**

This court has jurisdiction over appeals from "final decisions of the district courts[.]" 28 U.S.C. § 1291. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 521 (1988) (internal quotation marks omitted); *accord Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1026 (D.C. Cir. 2020).

In evaluating the finality of district court orders granting motions to dismiss, we must "distinguish[] between orders dismissing the *action*, which are final, and orders dismissing the *complaint*, which, if rendered without prejudice, are typically not final." *Attias v. CareFirst, Inc.*, 865 F.3d 620, 623 (D.C. Cir. 2017) (formatting modified); *see Ciralsky v. CIA*, 355 F.3d 661, 666–667 (D.C. Cir. 2004).

Sometimes it is difficult to tell "whether a district court intended its order to dismiss the action or merely the complaint." *Ciralsky*, 355 F.3d at 667. But not here. When the dismissal order contains "an express invitation to amend[,]" that language sends a "clear signal" that the district court "intended the action to continue" in that court, and so "reject[ed] only the *complaint* presented[.]" *See Attias*, 865 F.3d at 625. Because "[a] court that has extended such an invitation to amend clearly contemplates that there is still some work for the court to do before the litigation is over[,]" orders dismissing without prejudice and with express leave to amend

_____

defendants' motions to dismiss[.]" Notice of Appeal, *supra*, at 1–2. The Butterfly Association's briefing confirms that understanding by focusing entirely on the dismissal order, and nowhere addressing the denial of injunctive relief or asserting that jurisdiction exists under 28 U.S.C. § 1292(a)(1).

are not final. *See id.* at 624; *Murray v. Gilmore*, 406 F.3d 708, 712–713 (2005) (dismissal of a claim "without prejudice subject to reconsideration" was "akin to a grant of leave to amend," which is not an appealable final judgment); *cf. Castro County v. Crespin*, 101 F.3d 121, 127, 128 (D.C. Cir. 1996) (An order "provid[ing] that the case would be dismissed * * * with prejudice absent a request to reopen it within thirty days" was "not a final order subject to appeal" because "it contemplated * * * the possibility that the case would be litigated further in the event that settlement talks failed.").

*Attias* governs this case. The February 14th order granting the motions to dismiss the complaint was not final when entered because the court dismissed the constitutional claims without prejudice and with "an express invitation to amend[,]" *Attias*, 865 F.3d at 625, and also to seek emergency injunctive relief. Because the district court expressly stated its "inten[t] for the action to continue via amendment of the complaint * * *, its dismissal order is not final." *Id*. at 624; *id*. at 625 ("[A]n express invitation to amend is a much clearer signal that the district court is rejecting only the *complaint* presented, and that it intends the action to continue."); *see also Crespin*, 101 F.3d at 128 (holding that an order "did not end the litigation on the merits[] because it contemplated not only further settlement negotiations by the parties, *but the possibility that the case would be litigated further*") (emphasis added).

The majority opinion reasons that the district court's decision was final and appealable because the court dismissed "the entire 'case,' and all 'claims[.]'" Majority Op. 17 (quoting *North American Butterfly Ass'n v. Nielsen*, 368 F. Supp. 3d 1, 4, 10 (D.D.C. 2019); internal citation omitted). No order of the court ever said that, or even that the "case" was dismissed. Instead, the district court's *memorandum opinion* said once at the beginning that the "case" is dismissed. *North American*

*Butterfly*, 368 F. Supp. 3d at 4. But the accompanying order said only that the "defendants' motions to dismiss" the complaint "are GRANTED, plaintiff's constitutional claims are DISMISSED without prejudice, and plaintiff's statutory claims are DISMISSED with prejudice." Order, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. Feb. 14, 2019), ECF No. 46. The district court's accompanying minute order is still more explicit that the "Order dismiss[ed] plaintiff's Amended *Complaint*," not the case. Minute Order, *supra* (emphasis added). Holding the courthouse door wide open, the district court then expressly invited the Butterfly Association both to come back with an amended complaint and to again seek "injunctive relief" from the district court. *Id.*

That order of dismissal, and not the memorandum opinion, is what the Butterfly Association appealed. Notice of Appeal, *supra¸* at 1–2 (appealing "all aspects of the order * * * granting defendants' motion to dismiss[.]") (citing Order, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. Feb. 14, 2019), ECF No. 46). Because that order was a dismissal without prejudice that was accompanied by an "express invitation to amend" and to "request * * * injunctive relief," Minute Order, *supra*, it was not final and so not appealable, as *Attias* squarely held, 865 F.3d at 625.

As this court has ruled, finality turns not on looking at purported "dismissal language" in "isolation" even when it is in an order (let alone in just one page of a memorandum opinion). *St. Marks Place Housing v. United States Dep't of Housing and Urban Dev.*, 610 F.3d 75, 80 (D.C. Cir. 2010). Instead, this court must "read the district court's order[s] as a whole," and when that comprehensive reading disaffirms finality, as the orders did here, no final appealable judgment exists. *Id*.

The majority opinion relegates the district court order granting time to amend the complaint to mere "context" for reading the memorandum opinion as intending to enter a final judgment.  Majority Op. 12, 17.  But that gets the law backwards.  To the extent there is any perceived conflict between the memorandum opinion and the explicit operative language of the accompanying orders, "the language in the order is controlling."  *Friedland v. Zickefoose*, 538 F. App'x 122, 124 n.4 (3d Cir. 2013); *see Ciralsky*, 355 F.3d at 667 (while the district court's memorandum opinion "spoke several times of dismissing the complaint[,]" finality is found in part because the court's order granted a motion to dismiss the action, and the district court expressly denominated its order "a final appealable order"); *Dixon v. Edwards*, 290 F.3d 699, 720 (4th Cir. 2002) (Where there is a conflict between an opinion and order, the "Order is controlling because courts speak through their orders[.]"); *Eakin v. Continental Ill. Nat'l Bank & Trust Co.*, 875 F.2d 114, 118 (7th Cir. 1989) ("Judicial opinions do not create obligations; judgments do. * * * In the event of a conflict between the opinion and the judgment, the judgment controls."); *cf. Sea-Land Serv., Inc. v. Department of Transp.*, 137 F.3d 640, 647 (D.C. Cir. 1998) ("Appellate courts 'review judgments, not statements in opinions.'") (quoting *California v. Rooney*, 483 U.S. 307, 311 (1987)).

The majority opinion then waves off the court's explicit orders as just a nicety designed to reflect "judicial modesty and efficiency," Majority Op. 18, opining that the district court did not seriously "expect[] the case could be rescued through better pleading," *id*. at 17.

But finality is about order reading, not counter-textual mind reading.  The only workable course is to take the district court's orders "at [their] word."  *St. Marks Place*, 610 F.3d at 80; *see Attias*, 865 F.3d at 625 ("[A]n express invitation to

amend" is a "clear signal" that the district court "intend[ed] the action to continue[.]"). Especially since the district court expressly invited not only an amended complaint, but also a renewed application for emergency injunctive relief. In so ordering, the district court, at a minimum, "contemplated * * * the possibility that the case would be litigated further[.]" *Crespin*, 101 F.3d at 128.

Nor is there any dispute that the complaint could have been amended in a manner that would have been responsive to the court's order of dismissal. The Butterfly Association, for example, could have amended its Fourth Amendment claim to include the types of claims that the majority opinion notes were not raised in the dismissed complaint, such as alleging a seizure of effects or an intrusion on privacy. *See* Majority Op. 33. In addition, the Fifth Amendment claims were dismissed as "premature and thus unripe," Majority Op. 8 (internal quotations omitted), which the passage of time or reformulation of the claims (*e.g.*, alleging a regulatory taking or substantive due process claim, *see* Majority Op. 34) might have perhaps cured.

As I see it, there simply is no way to read the district court's order expressly inviting the Butterfly Association both to amend its complaint and to again seek injunctive relief from the court as the district court denying all relief or otherwise conclusively washing its hands of the case.

**B**

I also part company with the majority opinion in analyzing the jurisdictional consequences of what did and did not happen after the orders' entry. Recall that the district court's invitation to amend came with what seems like an expiration date: A new complaint was to be filed "within 14 days of the date of this Order." Minute Order, *supra*. That language, combined with

the district court's subsequent silence, implicates a longstanding circuit split on which our court had not specifically spoken until today: Does a non-final order dismissing a complaint without prejudice, but expressly granting leave to amend within a specified time period, automatically become final when the deadline passes without an amended complaint being filed? *See, e.g.*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (collecting cases).

Circuits on one side of the split take the position that a dismissal with express leave to amend is not final and does not become final just because the deadline passes. Those courts look to the nature of the order entered by the district court at the time of its entry, and leave control over the finality of a judgment in the district court's hands.[3]

Circuits on the other side are united in their view that non-final dismissals with express leave to amend can become final

---

[3] *See, e.g.*, *Richards v. Dunne*, 325 F.2d 155, 156 (1st Cir. 1963) (per curiam) (citing *Jung v. K. & D. Mining Co.*, 356 U.S. 335 (1958) (per curiam) for the proposition that another order from the district court is required to make the dismissal final); *Sapp v. City of Brooklyn Park*, 825 F.3d 931, 935–936 (8th Cir. 2016) (reasoning that "a bright-line approach" in which "a party granted leave to amend her complaint must obtain a final judgment before appealing a district court's dismissal" avoids uncertainty); *WMX Techs.*, 104 F.3d at 1135–1137 (holding that the Supreme Court's decision in *Jung* requires "a final order of dismissal from the district court" before the plaintiff may appeal); *Moya v. Schollenbarger*, 465 F.3d 444, 451 & n.9 (10th Cir. 2006) (explaining that, because orders expressly granting leave to amend are not final, plaintiffs who choose to appeal rather than amend must first obtain a final judgment from the district court).

without the district court doing anything else. But they fracture over what triggers that transformation.

The Fourth Circuit holds that an order is final if "the plaintiff elects to stand on the complaint" by waiving the right to amend. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 610–611 (4th Cir. 2020).

The Third Circuit requires a plaintiff to "stand on their complaint" either (i) by failing to take action before a deadline that "provides express notice" that missing the deadline will "automatically produce a final order of dismissal[,]" or (ii) by expressing a "clear and unequivocal intent to decline amendment and immediately appeal that leaves no doubt or ambiguity." *Weber v. McGrogan*, 939 F.3d 232, 237–240 (3d Cir. 2019).

Still other courts require nothing more than the passage of the time period set out by the district court.[4] The Seventh Circuit has dubbed this jurisdictional theory "springing finality." *Otis*, 29 F.3d at 1164.

The majority opinion claims not to take sides in the debate. *See* Majority Op. 16–17, 19. But to hold that the court has jurisdiction, it had to apply some rule. At times, the majority opinion embraces the springing finality rule. *Id.* at 12–13 ("[A]lthough the district court provided the Association a brief

---

[4] *See, e.g.*, *Otis v. City of Chicago*, 29 F.3d 1159, 1165–1166 (7th Cir. 1994) (en banc) (conditional dismissal becomes final when "the time to satisfy the condition has expired"); *Schuurman v. The Motor Vessel "Betty K V"*, 798 F.2d 442, 445 (11th Cir. 1986) (per curiam) (same); *see also Slayton & American Express Co.*, 460 F.3d 215, 224 & n.7 (2d Cir. 2006) (order becomes final when the plaintiff "disclaim[s] any intent to amend" or the time to amend expires).

opportunity to refile, 'that does not change the fact that, in the absence of such an affirmative act on [the Association's] part, the case [wa]s at an end' upon the expiration of that period.") (second alteration in original; quoting *Ciralsky*, 355 F.3d at 667); *id*. at 13 ("Because the district court unambiguously identified how, when, and why the case would end if there were no timely amendment—and there was none—the district court 'disassociate[d] itself from [the] case' and rendered its decision final.") (alternations in original; quoting *Gelboim v. Bank of America Corp.*, 574 U.S. 405, 408 (2015)); *id*. at 17 ("[T]his appeal, taken after expiration of the minute order's time-limited opportunity to amend, and appealing from the judge's dismissal order and accompanying opinion * * * addresses a final decision[.]"); *id* at 17–18 ("timely appeal without amendment [of the complaint]" suffices). In those statements, the majority opinion maps squarely onto the Seventh Circuit's springing finality rule because finality emerges from the passage of time alone, without any further action by or role for the district court.

Elsewhere the majority opinion widens the circuit conflict by proposing a whole new jurisdictional path trod by no other court: that the district court's order was final when entered, even before the window for filing an amended complaint closed. Majority Op. 13 ("The record adequately reflects the district court's intention that its order finally end the case[.]"); *id*. at 16–17 (describing "the judge's order and accompanying opinion" as "unambiguously dismiss[ing] the entire 'case' and all 'claims'"); *id.* at 19 (noting that the decision would be final "even if the judgment were treated as final on the date the underlying order was filed").

Either way, the central problem is that the Supreme Court has already rejected the majority opinion's jurisdictional approach and has agreed with those courts that require further

action from the district court to finalize the order of dismissal. *See Jung v. K. & D. Mining Co.*, 356 U.S. 335 (1958) (per curiam). On top of that, an alternative theory by which litigants would create their own finality would stray far from the relevant statutory text, structure, and ordinary principles of finality.

**1**

In *Jung v. K. & D. Mining Co.*, the Supreme Court confronted the same jurisdictional scenario involved here. 356 U.S. at 336–337. In a unanimous summary reversal, the Court flatly rejected the argument that a dismissal without prejudice accompanied by a set time for filing a new complaint metamorphosed into a reviewable final order as soon as that time expired. *Id.*

The *Jung* case began with an order just like the one here: The district court dismissed the plaintiffs' complaint on May 10, 1955, while granting them "twenty days from this date within which to file an amended complaint." 356 U.S. at 336. On May 27th, the district court denied the plaintiffs' motion to vacate, but agreed to extend the deadline for filing an amended complaint another twenty days. *Id.* The plaintiffs, though, never filed an amended complaint.

Nearly two years later, in March 1957, the plaintiffs informed the district court that they "elected to stand on their first amended complaint." *Jung*, 356 U.S. at 336. The court responded by ordering that "this cause of action be and it hereby is dismissed without costs." *Id.* The plaintiffs appealed only from that order of dismissal. *Id.*

The Seventh Circuit dismissed the appeal for lack of jurisdiction. *Jung*, 356 U.S. at 336. The court of appeals identified the jurisdictional question in terms identical to the

present case: "[W]hether the [district court's initial] order of May 27, 1955 became final and appealable upon expiration of the time for making amendment." *Jung v. K. & D. Mining Co.*, 246 F.2d 281, 282 (7th Cir. 1957), *rev'd*, 356 U.S. 335. The Seventh Circuit acknowledged "some authority for the proposition that another order is necessary after the time for amendment has passed in order to insure finality." *Id.* (citing *Cory Bros. & Co. v. United States*, 47 F.2d 607 (2d Cir. 1931) (per curiam)). But the court of appeals rejected that view. *Id.* at 283. Instead, the Seventh Circuit held that, because "no amendment was filed within 20 days from the order, and no appeal from that order taken within 30 days" of the filing period's expiration, the court lacked jurisdiction over the later-filed notice of appeal. *Id.; see id.* at 282 (decision "became final and appealable upon expiration of the time for making amendment"). That is, according to the Seventh Circuit, finality sprang up upon the expiration of the time set for filing an amended complaint, and that was when the time for appealing began to run.

The plaintiffs sought certiorari on the questions (i) whether the 1955 order extending the time to amend was a final decision under 28 U.S.C. § 1291, (ii) whether the 1957 order of dismissal was a final decision, (iii) when the district court intended to terminate the litigation, and (iv) whether the district court "los[t] jurisdiction of the cause by mere expiration of the time to file amendment to the complaint[.]" Petition for Writ of Certiorari at 3, *Jung*, 356 U.S. 335 (No. 619).

The Supreme Court granted certiorari and summarily reversed the Seventh Circuit, resoundingly rejecting that court's holding that the district court's judgment of dismissal became final and appealable once the designated time period for amending the complaint had passed. *Jung*, 356 U.S. at 337–338. The Court held that the May 1955 order "granting further

14

leave to [the plaintiffs] to amend their complaint did not constitute the final judgment in the case" because "[i]t did not direct 'that all relief be denied' (Rule 58 of Federal Rules of Civil Procedure) but left the suit pending for further proceedings either by amendment of the complaint or entry of a final judgment." *Id.* at 336–337 (formatting modified). Adopting the Second Circuit's view in *Cory Brothers*, the Supreme Court explained that "another order of absolute dismissal after expiration of the time allowed for amendment is required to make a final disposition of the cause." *Jung*, 356 U.S. at 337 (quoting *Cory Bros.*, 47 F.2d at 607).

The Supreme Court, in other words, unanimously ruled that an order dismissing a complaint for failure to state a claim and also setting a time limit to file a new complaint is *not* a reviewable final decision. According to the Supreme Court, the district court judgment was not final when entered; it was not final when the designated (and then extended) window for filing a new complaint expired; and it did not become final at any point in the ensuing years of inaction by the district court and the parties prior to March 1957. *See Jung*, 356 U.S. at 336–337.

Rather, the Supreme Court ruled that a reviewable final order first materialized two years later when the district court entered, in response to the plaintiffs' notice that they "elected to stand on their first amended complaint[,]" an order stating that "this cause of action be and it hereby is dismissed without costs." *Jung*, 356 U.S. at 336; *see id.* at 337. That dismissal of the "cause of action" was an order "direct[ing] 'that all relief be denied' and required 'the clerk [to] enter judgment' accordingly." *Id.* (alteration in original) (quoting the then-current version of Rule 58).

The Supreme Court recognized that, as the two-year delay illustrated, its understanding of finality would sometimes lead to seemingly "useless delays in litigation[.]" *Jung*, 356 U.S. at 337. But that concern, the Supreme Court explained, was "more than offset by the hazards of confusion or misunderstanding as to the time for appeal." *Id.* That is all the more true because the delay could easily have been avoided if the district court, on its own or at the behest of a party, had issued an order that "put a definitive end to the case." *See id.*

So the jurisdictional question in this case has already been asked and answered. The Supreme Court sided with the Second Circuit's decision in *Cory Brothers* that required further action by the district court, adopting in terms that circuit's rule that "another order of absolute dismissal after expiration of the time allowed for amendment is required to make a final disposition of the cause." *Jung*, 356 U.S. at 337 (quoting *Cory Bros.*, 47 F.2d at 607). The only difference between the non-final May 27, 1955 order in *Jung* and the February 14, 2019 order here is the date. That means the Supreme Court has told us exactly what to do with this appeal: Dismiss it for lack of jurisdiction.

**2**

None of the circuits that have taken a contrary approach have offered a persuasive justification for casting aside that binding Supreme Court precedent.

For starters, the statutory provisions governing this issue have not changed in any relevant way since *Jung*. The relevant part of 28 U.S.C. § 1291 said then what it says now: "The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States * * * except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1291 (1952); *id.* (2018) (same, plus a

parenthetical excluding the Federal Circuit). And then, as now, the time for appeal ran from "the entry of [the] judgment, order or decree" appealed. *Id.* § 2107 (1952); *id.* § 2107(a) (2018) (same, but now with subdivisions).

Nor has the language of Federal Rule of Civil Procedure 58 changed in any material respect. At the time of *Jung*, Rule 58 read in relevant part: "When the court directs * * * *that all relief be denied*, the clerk shall enter judgment forthwith upon receipt by him of the direction," and "[t]he notation of a judgment in the civil docket as provided by Rule 79(a) constitutes the entry of the judgment * * * ." FED. R. CIV. P. 58 (1946), *reprinted in* 28 U.S.C. § 723c app. at 3318 (1946) (emphasis added).

The current rule contains similar operative language. *See* FED. R. CIV. P. 58(b)(1) (directing the clerk to enter the judgment without the court's direction when "the court denies all relief"); FED. R. CIV. P. 58(c) (linking the time of entry of the judgment to the time it "is entered in the civil docket under Rule 79(a)"). Rule 58 is different now in that it calculates the "[t]ime" of entry of a final judgment differently, pegging it to the entry of an order in the civil docket under Federal Rule of Civil Procedure 79(a) plus the earlier of either the entry of a separate document or the passage of 150 days. FED. R. CIV. P. 58(c)(2). But what is relevant here is that the predicate requirement of an order from the district court that "denies all relief" remains the same. FED. R. CIV. P. 58(b)(1)(C).

Nevertheless, the courts of appeals that have perpetuated the springing finality route to jurisdiction have paid *Jung* little heed.

The Seventh Circuit argued that reading *Jung* as doing exactly what it did—rejecting springing finality—would be to "assume[] incorrectly that the maximum number of

opportunities to appeal is one." *Otis*, 29 F.3d at 1166. The *Otis* court reasoned that 28 U.S.C. § 1291 "speaks of final 'decisions,'" which "may occur in advance of final 'judgments[,]'" as evidenced by the collateral order doctrine. *Id.* at 1166–1167. Because, in the Seventh Circuit's view, *Jung* "did not consider whether a prior appeal would have been possible[,]" it left the door open to springing finality. *Id.*

But no one suggests that this appeal fits within the collateral order doctrine. Beyond that, the Supreme Court has said what counts as a final decision: "A final decision 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Hall v. Hall*, 138 S. Ct. 1118, 1123–1124 (2018) (quoting *Ray Haluch Gravel Co. v. Central Pension Fund of Operating Eng'rs & Participating Employers*, 571 U.S. 177, 183 (2014)). And the Supreme Court has said in terms that a decision granting further leave to amend within a designated time period "did not constitute the final judgment in the case," and "another order of absolute dismissal after expiration of the time allowed for amendment is *required* to make a final disposition of the cause." *Jung*, 356 U.S. at 337 (emphasis added) (quoting *Cory Bros.*, 47 F.2d at 607). Not to mention that the whole point of the requirement of finality in 28 U.S.C. § 1291 is to avoid piecemeal appellate litigation by channeling the issues into one appeal when the case is ended. *See Microsoft Corp. v. Baker*, 127 S. Ct. 1702, 1712 (2017) ("'From the very foundation of our judicial system,' the general rule has been that the 'whole case and every matter in controversy in it [must be] decided in a single appeal.'") (quoting *McLish v. Roff*, 141 U.S. 661, 665–666 (1891)).

The Second Circuit, for its part, relegated *Jung* to a footnoted "*But see*" citation, with a parenthetical describing it as a case "where no notice of appeal was filed[.]" *Slayton*, 460 F.3d at 224 n.7. True, but irrelevant. The Supreme Court

said specifically what was needed to establish finality, and it was "another order of absolute dismissal" by the district court, not a notice of appeal by a party. *Jung*, 356 U.S. at 337 (quoting *Cory Bros.*, 47 F.2d at 607).

That means that some further action from the district court is needed to transform a non-final and conditional dismissal without prejudice, with an invitation to amend, into a concrete termination of the "cause of action" that will conclusively deny all relief and support appellate jurisdiction, *Jung*, 356 U.S. at 337. After all, a notice of appeal is supposed to be *from* a final judgment; it does not *create* a final judgment. A plaintiff's notice of appeal also is not further action *from the district court* signaling that it is now finished with the case. Nor is it a judgment or order of the court "denying all relief" that can be entered on the docket by the clerk of the district court.

The springing finality concept, in other words, endorses a concept of finality in which final judgments would materialize out of the air with a wave of a party's pleading, but would never show up on the case docket. All the docket would record is an expressly non-final decision. That cannot be right.

The Eleventh Circuit, for its part, tried to avoid direct eye contact with *Jung*'s holding, reasoning that its version of springing finality "prevents the impropriety of situations such as" the two-year delay in *Jung*. *Schuurman v. The Motor Vessel "Betty K V"*, 798 F.2d 442, 445 (11th Cir. 1986) (per curiam).

It sure does. Yet that is hardly a ground for ignoring Supreme Court precedent. Especially when the Supreme Court already addressed that very problem and expressly struck a different balance between delay and clear, administrable rules of finality. The Supreme Court openly acknowledged that "nearly two years [had] elapsed" before the final judgment was

entered. *Jung*, 356 U.S. at 337. But it explained that such delay could have been easily remedied by the parties asking the court, and the court agreeing, to make the judgment final. *Id.* The Court then added: "The undesirability of useless delays in litigation is more than offset by the hazards of confusion or misunderstanding as to the time for appeal." *Id.*; *see also In re United States*, 844 F.2d 1528, 1537–1538 (11th Cir. 1988) (Kravitch, J., specially concurring) (suggesting that *Schuurman* "may be in conflict with the principles expressed in *Jung*").

Finally, the majority opinion here treats *Jung* as a ruling about Federal Rule of Civil Procedure 58 and its requirement that a separate paper judgment be entered by the district court. Majority Op. 15–16. Not so.

*Jung* addressed the very same question presented here: Whether the "District Court's order of May 27, 1955, denying petitioners' motion to vacate the order of May 10, 1955, but granting further leave to petitioners to amend their complaint" was "the final judgment in the case" that the plaintiffs should have appealed. *Jung*, 356 U.S. at 334–335. The court of appeals decision that the Supreme Court unanimously reversed addressed only finality under 28 U.S.C. § 1291. *Jung*, 246 F.2d at 282. The decision never mentioned Rule 58. The petition for a writ of certiorari raised finality under 28 U.S.C. § 1291 in its first question presented, and never discussed or even cited Rule 58. Petition for Writ of Certiorari at 3, *Jung*, 356 U.S. 335 (No. 619). The brief in opposition to certiorari likewise focused on finality and never referenced Rule 58. *See* Respondents' Reply Brief to Petition for Writ of Certiorari at 7, *Jung*, 356 U.S. 335 (No. 619) ("[W]e think the Circuit Court of Appeals was justified in holding that the appeal was *not filed in time*[.]") (emphasis added). And the *Cory Brothers* rule requiring the entry of another order "to make a final disposition

of the cause" that the Supreme Court expressly adopted, *Jung*, 356 U.S. at 337, never mentioned Rule 58 either.[5]

The majority opinion is correct that Rule 58 has since been amended to allow the time of entry of a final judgment to be measured by the passage of 150 days if no order is entered on the docket. Majority Op. 16. But that puts the cart before the horse. Rule 58's timing provision does not even come into play until there first is a district court judgment that "denies all relief." FED. R. CIV. P. 58(b) & (b)(1)(C). That antecedent question—whether the district court itself ever wrapped up the case by denying all relief—is the issue in this case. We do not even get to the Rule 58 question of formalizing the judgment until such a final decision is entered.

*Jung* likewise was all about that predicate question of whether the district court had entered a final judgment denying all relief, not the timing of the docket entry memorializing such a judgment if there were one. *Compare* FED. R. CIV. P. 58(b) & (b)(1)(C) (specifying which judgments can be entered, which includes a judgment in which "the court denies all relief"), *with* FED. R. CIV. P. 58(c)(2) (specifying the "[t]ime" at which the judgments identified in Rule 58(b) can be entered on the docket). That is why, to the extent the Supreme Court referenced Rule 58, it focused on whether "all relief [was] denied" by the district court order that allowed leave to amend. *Jung*, 356 U.S. at 337; *cf. Bankers Trust Co. v. Mallis*, 435 U.S. 381, 387 (1978) (holding that a separate docket entry under Rule 58 was not necessary where the district court "clearly evidenced its intent that the opinion and order from which an appeal was taken would represent the final decision in the

---

[5] Because the Supreme Court summarily reversed the Seventh Circuit's springing approach to finality, no other briefs were filed in the case.

case"); *id*. at 382 n.1 (quoting the district court's memorandum opinion as stating, "Complaint dismissed in its entirety. So Ordered").

Like *Jung*, this case is not about the absence of a separate Rule 58 paper judgment from the district court. It is about the presence as the last entry on the docket of an expressly non-final order that on its face showed that the district court was not done with the case. That order, the Supreme Court has ruled, "*left the suit pending for further proceedings* 'either by amendment of the [complaint] or entry of a final judgment.'" *Jung*, 356 U.S. at 337 (emphasis added; quoting *Missouri & Kansas Interurban Ry. Co. v. City of Olathe*, 222 U.S. 185, 186 (1911)).

Equally important, the district court's orders here did not "den[y] all relief," FED. R. CIV. P. 58(b)(1)(C). Quite the opposite, the district court expressly invited the plaintiffs to file a new complaint and to request "emergency injunctive relief." Minute Order, *supra*. The district court, in other words, did not "unambiguously dismiss[]" the litigation. Majority Op. 17. It expressly invited another round. Nor could the court in any sense have "denied all relief" when the order expressly invited further application for relief.

The majority opinion also seems to place weight on whether the district court's order granting time to file an amended complaint was "unsolicited" or requested. Majority Op. 12, 18. The Supreme Court in *Jung* attached no legal significance to that factor. Nor does it seem workable to require litigants and courts of appeals to look behind the face of the court's order or docket and root around in the district court record for indicia of either the court's motivation or such a suggestion or preference among the parties' filings and statements to the court. "Motives are difficult to evaluate,

while jurisdictional rules should be clear." *Lapides v. Board of Regents of Univ. System of Georgia*, 535 U.S. 613, 621 (2002).

Finally, the majority opinion attempts to escape *Jung* by distinguishing the orders from which the appeal was taken in that case and ours. But there is no difference. The district court in *Jung* dismissed the "complaint," *Jung*, 346 U.S. at 337. The district court's order here likewise "dismiss[ed] plaintiff's Amended Complaint" and granted the "defendants' motions to dismiss," which were captioned motions to dismiss the complaint. *See* Order, *supra*; Motion to Dismiss at 1, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. May 25, 2018), ECF No. 25; Defendants' Supplemental Motion to Dismiss at 2, *North American Butterfly*, No. 1:17-cv-02651-RJL (D.D.C. Nov. 5, 2018), ECF No. 34. The order's dismissal of "claims"—which appear only in complaints—proves that there was no dismissal of the case.[6]

---

[6] *FirsTier Mortgage Co. v. Investors Mortgage Insurance Co.*, 498 U.S. 269 (1990), is off point. That case expressly did not decide the question of finality that is at issue here. *Id*. at 274, 277. Instead, the Court decided only that, under Federal Rule of Appellate Procedure 4(a)(2), a notice of appeal was effective when it was filed (i) after a bench ruling that both dismissed all claims and advised that "the losing party has a right to appeal," *id*. at 271, but (ii) before the district court's entry of its written decision and judgment. *Id*. at 275–277. The Court explained that FirsTier was "reasonable" to think the bench ruling was appealable, and so its "premature" notice of appeal was effective to appeal the *later-entered judgment* under the plain terms of Federal Rule of Appellate Procedure 4(a)(2). *Id*. at 277; *see id*. at 276–277. That case did not involve claims expressly dismissed without prejudice; it did not involve an explicit invitation from the district court to return with an amended complaint and renewed request for relief; and it did not involve a case in which no final order or judgment concluding the case was ever entered.

In short, this case is on all fours with *Jung*'s holding and analysis. In my view, we are duty bound to follow that precedent and dismiss this case for lack of a final, appealable order.

**3**

In addition to being binding, *Jung*'s holding also aligns with the text, structure, and precedent applying 28 U.S.C. § 1291 and related statutes.

First, an order's finality—or not—is fixed at the time that order's issuance is entered on the docket. Section 1291 and 28 U.S.C. § 2107 work in tandem to set the rules for appellate jurisdiction over district courts' final decisions. Section 1291 identifies which decisions are appealable, and Section 2107 sets the jurisdictional deadline for appealing them. *See Hamer v. Neighborhood Housing Servs. of Chi.*, 138 S. Ct. 13, 20–21 (2018).

By providing that the clock runs from "the *entry* of [the] judgment, order or decree" being appealed, 28 U.S.C. § 2107(a) (emphasis added), Congress indicated that an order is either final or not—and so appealable or not—when it hits the docket. *See Hentif v. Obama*, 733 F.3d 1243, 1246 (D.C. Cir. 2013). Under Section 2107(a), "entry" is the "act of making or entering a record" or "the placement of something before the court or on the record." *Hentif*, 733 F.3d at 1246 (formatting modified).

Congress, in fact, has long started the clock for appeals from "the entry" of the relevant order, and the Supreme Court has long understood "the entry" in this context to be the act of recording the order on the docket. *See Polleys v. Black River Improvement Co.*, 113 U.S. 81, 83–84 (1885) (interpreting a statute identical in relevant part to Section 2107(a), and holding

that "the entry" of a judgment occurred when it was "entered in the order book, or record of the court's proceedings"); *cf. Ex parte Morgan*, 114 U.S. 174, 174–175 (1885) (referring to the clerk's "ministerial act of recording a judgment" as the "entry" of the judgment); *Hentif*, 733 F.3d at 1246.

That understanding of "entry" is incompatible with springing finality. If the time for appeal runs from the time an order is entered, but the order only later becomes final for purposes of appeal under 28 U.S.C. § 1291, then the time for an appeal would begin—and could end—before the order even becomes appealable. That would make no sense.

In adopting its springing finality rule, the Seventh Circuit expressed its "belie[f] that 'entry' should be deemed to occur on the date the condition is satisfied or the time to satisfy it ends." *Otis*, 29 F.3d at 1167–1168. Springing finality, in other words, requires a hypothesized docket entry tied to the action or inaction of a litigant, not an order of the court.

Yet as a matter of settled usage, "entry" on the docket cannot reasonably be read to mean the occurrence or not of some event by independent non-judicial actors long after the relevant order is entered, while the docket remains unchanged. Congress, in other words, chose to measure the time to appeal by reference to the court and its docket, and courts are not free to replace that rule with some kind of totality of the circumstances test. *Cf. Strange ex rel. Strange v. Islamic Republic of Iran*, No. 19-7083, 2020 WL 3886202, at *7 (D.C. Cir. July 10, 2020) ("We are without power to create for ourselves otherwise nonexistent jurisdiction, in a fashion that cannot be grounded in the statutory text[.]") (internal quotation marks omitted).

The Federal Rules of Appellate Procedure are of the same mind. As validly promulgated federal rules of procedure, those

Rules "have the force of law, and the court is not free to ignore their interpretation of a jurisdictional requirement." *Hentif*, 733 F.3d at 1246; *see Bowles v. Russell*, 551 U.S. 205, 208 (2007).

Appellate Rule 4(a)(7)(A) provides that, in calculating the time to appeal, "[a] judgment or order is entered" when it "is entered in the civil docket under" Civil Rule 79(a) and, where Civil Rule 58(a) "requires a separate document," either that requirement has been satisfied or when "150 days have run from entry of the judgment or order[.]" FED. R. APP. P. 4(a)(7)(A); *see* FED. R. CIV. P. 58(a) (requiring most "judgment[s] and amended judgment[s] [to] be set out in a separate document"). So "the entry" in Section 2107(a) is the act described in Rule 79(a).

Rule 79(a) describes a kind of "entry" that can only happen by changing the docket. The rule requires the clerk of court to keep a "civil docket" and to "mark[]" certain "items," including "orders, verdicts, and judgments[,]" "with the file number" and "enter[] [them] chronologically in the docket[.]" FED. R. CIV. P. 79(a)(1)–(2). "Each entry must briefly show the nature of the paper filed or writ issued, the substance of each proof of service or other return, and the substance and date of entry of each order and judgment." FED. R. CIV. P. 79(a)(3). The mere passage of days does none of those things.

This case illustrates the point. Despite this court's hinting (Majority Op. 13, 16–17, 19), no court has ever held that an order like the one from which the Association appealed was a final order of dismissal when it was entered on the court's docket with an open invitation to file a new complaint and seek emergency injunctive relief in a specified time period. Yet whenever finality attached under the majority opinion's rule— entry of the order inviting an amended complaint on the docket

or expiration of the time period for amendment—there is no question that the docket remained static.

Worse still, without the docket entry of an order terminating the case as the starting point for the time to appeal, courts and parties will be left "in a quandary about the proper timing of their appeals," *Gelboim*, 574 U.S. at 414, forced to guess as to when the clock began and stopped running.

Case in point: This one. The majority opinion itself gives no answer as to whether the time for appeal started running when the order dismissing the case was entered on the docket, or fifteen days after if no amended complaint was filed. But what happens if the court grants an extension of time on the sixteenth day? Or if a plaintiff miscounted and files an amended complaint on the fifteenth or sixteenth day? What if six months after the time to file an amended complaint expired, the Association advised the district court that it was standing on its original complaint, and the district court then entered an "order of absolute dismissal" pursuant to *Jung*, 356 U.S. at 337? Surely the Association could have appealed that final judgment as *Jung* expressly held. And what about a defendant who wants to appeal adverse portions of a judgment? Does the defendant's time to appeal run from the entry of the order of dismissal without prejudice, since it has no complaint to amend? Can the order be final for the defendant but not for the plaintiff? How many appealable "final" orders can arise from a single ruling dismissing a complaint without prejudice? Is jurisdictional finality really a buffet of choices? The majority opinion studiously avoids answering any of those questions raised by its holding. Majority Op. 16–17, 19.

Such uncertainty and unpredictability are no good for jurisdictional rules. Rather, "jurisdictional rules should be, to the extent possible, clear, predictable, bright-line rules that can

be applied to determine jurisdiction with a fair degree of certainty from the outset." *DSMC Inc. v. Convera Corp.*, 349 F.3d 679, 683 (D.C. Cir. 2003) (Roberts, J.), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009); *see Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 582 (2004) ("Uncertainty regarding the question of jurisdiction is particularly undesirable, and collateral litigation on the point particularly wasteful."). That is why, in *Jung*, the Supreme Court said that any concerns about delay caused by waiting for the district court to enter "another order of absolute dismissal after expiration of the time allowed for amendment" would be "more than offset by the hazards of confusion or misunderstanding as to the time for appeal." *Jung*, 356 U.S. at 337.

Nor can courts "deem[]" their way around this problem, as the Seventh Circuit suggests, *Otis*, 29 F.3d at 1167. The rule defining "entry" provides a limited authority to deem the "entry" of certain orders on the docket—those in which the court has "denie[d] all relief," FED. R. CIV. P. 58(b)(1)(C), but has failed to comply with the separate-document requirement for papering that final judgment. FED. R. APP. P. 4(a)(7)(A)(ii).

No similar provision in the rules licenses courts to deem orders to be "final" and to deny all relief when their plain terms do neither. *Cf. Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.") (internal quotation marks omitted).

Deeming a finality that is absent from the face of the district court's order is an entirely different magnitude of operation from deeming paperwork done. All that Rule 4(a)(7)'s deeming provision does is give effect to the district court's entry of a decision that objectively and on its

face denies all relief and terminates the case. In that way, Rule 4(a)(7)(A) simply averts a procedural glitch—the failure to set a judgment out in a separate document—from eliminating the deadline to appeal. *See* FED. R. CIV. P. 58(a) (requiring a separate document only for a "judgment" or "amended judgment"); FED. R. CIV. P. 54(a) (defining "judgment" as "a decree and any order from which an appeal lies"); *see also* FED. R. APP. P. 4(a)(7) advisory committee's note to 2002 amendment (explaining that the deeming provision is meant to "ensure that parties will not be given forever to appeal * * * when a court fails to set forth a[n appealable] judgment or order on a separate document in violation of" Rule 58(a)).

Meanwhile, Rule 4(a)(7)(B) ensures that parties can appeal a final decision "without waiting for [it] to be set forth on a separate document." FED. R. APP. P. 4(a)(7) advisory committee's note to 2002 amendment; *see* FED. R. APP. P. 4(a)(7)(B) (providing that the lack of a separate document "does not affect the validity of an appeal from" a final judgment).

Said another way, the problem here, as in *Jung*, is one of substance, not paperwork. The obligation to enter a judgment under Rule 58 was not even triggered because the district court's order was non-final: The order *invited* the Association to seek more relief; it did not deny all relief. What makes a decision final is that it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Van Cauwenberghe*, 486 U.S. at 521. The district court, though, expressly left the door open for additional proceedings.

The majority opinion reasons that the district court was left with nothing to do upon the expiration of the fourteen-day filing window. Majority Op. 13. But the plaintiff remained

free to file, and the district court free to act upon, a belated motion for extension of time or a tardy amended complaint. *See* FED. R. CIV. P. 6(b)(1) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time * * * (B) on motion made *after the time has expired* if the party failed to act because of excusable neglect.") (emphasis added); *see, e.g.*, *Ciralsky*, 355 F.3d at 667 (although district court order afforded the plaintiff 21 days to file an amended complaint, the district court did not enter a final order dismissing the case for another ten months). Of course, it is probably a safe bet that the case will be over once the deadline passes. But finality under 28 U.S.C. § 1291 requires more than gamblers' odds.

What is critical here is that the district court's order sets out only its expectation as to when the case *might be* over, not its final determination that the case *is* over. Truncating the district court's authority to grant an extension or to otherwise revisit its disposition "wrest[s] control of the litigation's finality out of the district court's hands[,]" *Shatsky*, 955 F.3d at 1027. Ordinarily, it is for the district court "alone [to] determine[] when the case [is] over[.]" *Dukore v. District of Columbia*, 799 F.3d 1137, 1142 (D.C. Cir. 2015); *see Jung*, 356 U.S. at 337 (focusing the finality inquiry on the district court's actions and its "power * * * over its own calendar" to "fix an unequivocal terminal date for appealability"); *Blue v. District of Columbia Pub. Sch.*, 764 F.3d 11, 18 (D.C. Cir. 2014) (Given "the role of the district court as gatekeeper for the court of appeals[,]" parties cannot themselves make a non-final dismissal of some claims final by dismissing the remaining claims without prejudice.); *St. Marks Place*, 610 F.3d at 80 ("[D]istrict courts can choose when to decide their cases.").[7]

---

[7] *See also Shatsky*, 955 F.3d at 1026 ("It is the district court, not the parties, that must control the terms of dismissal so as to prevent

None of this is to say that non-final orders are forever insulated from review under Section 1291. As the Supreme Court explained in *Jung*, parties can ask the court to "put a definitive end to the case." 356 U.S. at 337. And when the district court eventually enters a final decision and a party takes a timely appeal from that decision, the court of appeals has "authority to review the interlocutory orders that preceded it based on the principle that such orders merge into the final decision." *LeFande v. District of Columbia*, 841 F.3d 485, 491 (D.C. Cir. 2016); *see also Ciralsky*, 355 F.3d at 668 & n.7 (collecting cases, and holding that a non-final order that expressly granted leave to amend was an "interlocutory ruling[]" that merged with the court's final decision).

In sum, adhering to *Jung* leaves the jurisdictional lines clear, and control over finality remains in the hands of the district court. By contrast, resting jurisdictional finality on a contextual divination of intent that supersedes the decidedly non-final language of the district court's last order risks leaving finality in the eye of the beholder and "encourag[ing] * * * jurisdictional litigation," *Grupo Dataflux*, 541 U.S. at 581–582.

The better path, in my view, is to follow on-point Supreme Court precedent and settled rules and principles of finality. Strictly enforcing the rule that parties may not appeal under Section 1291 until the district court enters an order concluding the case and denying all relief "requires only a modicum of diligence by the parties and the district court, avoids uncertainty, and provides for a final look before the arduous appellate process commences." *WMX Techs.*, 104 F.3d at

---

manipulation of the courts' jurisdiction.") (formatting modified) (quoting *Dukore*, 799 F.3d at 1141).

1136. That also leaves control over finality right where it belongs—in the trial court's hands.

For all of those reasons, I would dismiss this appeal for lack of jurisdiction. I respectfully dissent.